**Shanell Monique MOSLEY, Appellant,**

v.

**The STATE of Texas, Appellee.**

**Nos. 01–08–00937–CR, 01–08–00938–CR.**

Court of Appeals of Texas,
Houston (1st Dist.).

Dec. 30, 2010.

Discretionary Review Refused
May 25, 2011.

---

Robert Morrow, Attorney at Law, The Woodlands, TX, for Appellant.

Eric Kugler, Assistant District Attorney of Harris County, Kenneth Magidson, Harris County District Attorney, Houston, TX.

Panel consists of Justices JENNINGS, ALCALA, and MASSENGALE.

## OPINION ON PETITION FOR DISCRETIONARY REVIEW

MICHAEL MASSENGALE, Justice.

In light of the petition for discretionary review filed by appellant, we withdraw our previous opinion of August 31, 2010. Our judgment of the same date remains unchanged. *See* TEX.R.APP. P. 50. We substitute the following opinion in its stead.

Appellant Shanell Monique Mosley was convicted of abandoning two children. *See* TEX. PENAL CODE ANN. § 22.041(a), (b), (d)(1) (Vernon Supp. 2009). The trial court assessed punishment in each of the two cases at two years in state jail, suspended, and placed Mosley on community supervision for five years.[1] *See* TEX. PENAL CODE ANN. § 12.35(a) (Vernon Supp. 2009) (state-jail felony); TEX.CODE CRIM. PROC. ANN. art. 42.12, § 15 (Vernon Supp. 2009) (community supervision).

Mosley brings five points of error, claiming the evidence is legally and factually insufficient to prove Mosley intended to abandon the children, the evidence is legally and factually insufficient to prove Mosley left the children under circumstances that exposed them to an unreasonable risk of harm, and the trial court erred in the admission of evidence. We affirm.

## Background

We begin our analysis by summarizing testimony and evidence adduced at trial relevant to the issue of whether Shanell Mosley abandoned her children under circumstances that exposed them to an unreasonable risk of harm.[2]

### A. Mosley's family and marriage plans

Mosley and her extended family are originally from Louisiana. While living there, Mosley met her future husband, George Anichukwu, who was from the Republic of Benin, a country in western Africa. They established a long-distance relationship, communicating by telephone after Anichukwu returned to Benin.

After Hurricane Katrina, Mosley and her children moved to Texas. Anichukwu subsequently asked Mosley to marry him. Because Anichukwu was not a United States citizen, an immigration lawyer advised the couple to marry in Africa so he could obtain a spousal visa. Mosley planned to leave Houston on December 31, 2007 to visit Africa for six weeks, get married in Nigeria, and help Anichukwu open a nonprofit organization for children.

### B. Mosley's child-care plans during her trip to Africa

At the time of Mosley's trip to Africa, she had six children, whose ages were as follows: J.R., a one-year-old male; Z.M., a seven-year-old male; AA.M., an eight-year-old female; AN.M., a nine-year-old male; E.M., a fifteen-year-old female; and

---

1. The complainants were a one-year-old male, J.R. (trial court case number 1182323; appellate case number 01–08–00937–CR), and an eight-year-old female, AA.M. (trial court case number 1182322; appellate case number 01–08–00938–CR).

2. We note at the outset that a substantial amount of evidence at trial and arguments in the appellate briefs was directed to conflicting accounts related to the cleanliness of the Mosley home. Because this evidence has no bearing on our resolution of this appeal, we exclude it from this summary.

T.M., a sixteen-year-old female. Mosley did not want to take one-year-old J.R. to Africa because she was planned to stay in a house with no electricity or running water, and she was concerned he might get sick. She also said she could not afford to bring any of her other children with her on the trip.

Mosley testified that her close family members were involved in preparing for the wedding and the planning to take care of her children. Her primary child care plan was for the children to be supervised during the entirety of her six-week absence by her sister Shaqual Mosley, who was to come to Houston from Louisiana. Shaqual testified that Mosley asked her about six months in advance to look after the children during the anticipated trip to Africa. Mosley's backup plan was for the children to be cared for by her friend Shawn Harrison, for whom she was a regular babysitter.

Mosley said she left $2,000 for Shaqual to take care of the children, as well as medicine and medical records. She also left emergency telephone numbers, both written and stored in the home phone and in her mobile phone. She testified that she left food in the house and that before she left, she cooked food for Shaqual to feed the children. She also gave the keys to her van to her fifteen-year-old daughter E.M., along with between $100 and $200 for food and some credit or debit cards.[3]

Mosley originally expected Shaqual to arrive in Houston on December 29 by getting a ride with a friend. Shaqual testified that she was planning to travel by bus on that day, but did not because bus fares were higher than she expected during the holiday season. Mosley offered to send money to Shaqual, but she declined, saying she was going to get the money from a brother. Although she knew Shaqual could not come to Houston on December 29, Mosley said she did not change her plans at that time because her $1,600 plane ticket was nonrefundable.

Mosley thought that Shaqual would be arriving on the bus on December 30, and she asked Harrison to meet her at the bus station. But Shaqual did not arrive that day either.

The next plan was for Shaqual to arrive in Houston on December 31—the same day as Mosley's scheduled trip to Africa on a flight departing at 4:40 p.m. Shaqual called Mosley at 6:03 a.m. to say that she was catching an 8:00 a.m. bus that would arrive in Houston at 2:00 p.m. But that was not true. Shaqual had been unable to get bus money from her brother, and instead of so informing Mosley, she told her to go ahead with her travel plans because she had promised to not let her down.

Shaqual also called their cousin, Diana Jackson, who lived in the Houston area. Shaqual testified that she asked Jackson to take care of Mosley's children, but that Jackson was uncomfortable with taking that responsibility. Shaqual then talked to E.M. and told her to stay inside the house with the other children. Shaqual told E.M. that if Mosley called the house, "Don't tell her I'm not there because I didn't want her to freak out or panic."

Meanwhile, Mosley did not realize until that day that she needed to be at the airport before Shaqual's 2:00 p.m. arrival. When she realized the problem, she again asked Harrison to pick up Shaqual. He took Mosley to the airport and left his own

---

3. Mosley's sixteen-year-old daughter T.M. also testified that Mosley had left $2,000 in cash, along with bank cards, hidden in a closet and that E.M. knew where the cash and cards were.

two young children to be watched by Mosley's older children.

Shaqual said that she and Mosley spoke with each other more than twenty times on December 31 and that Mosley told her that she needed to be on the bus before Mosley boarded her plane. Mosley testified that she talked to Shaqual on the phone before she left for the airport, and she was confident that Shaqual was on her way to Houston. Shaqual testified that in their last conversation that day, when Mosley was at the airport, she told her that she was on the bus and three hours away from Houston. E.M. testified that she also spoke with Mosley on the phone before her plane left, and told her that "Shaqual was almost here." This was not true, however, as Shaqual never left her house. Shaqual said that she told Mosley she was on her way because she did not want her to worry.

Mosley admitted that she left on her flight to Africa without knowing whether Shaqual had in fact arrived to take care of the children. She planned to call and check on Shaqual once she landed in Africa on January 1.

C. *Events following Mosley's departure*

a. *December 31*

In Shaqual's absence, fifteen-year-old E.M. was looking after her four younger siblings, as well as Harrison's two young children, while her mother was being taken to the airport. E.M. had the credit or debit cards that had been left by her mother, but she was unable to use them to withdraw money because she did not know

how to use them. E.M. testified that she felt very overwhelmed by having to be responsible for all the children. Turner stated that she saw E.M. unsuccessfully attempt to withdraw money using a debit card so she could buy groceries.

At this time E.M. was on probation for assault, and her juvenile-court advocate was S. Turner.[4] Sometime around noon that day, E.M. had called Turner and told her that Shaqual had not yet arrived. Turner went to the house around 3:45 p.m. and found E.M. outside in the van, holding the car keys. E.M. told Turner that she was only charging her phone and promised she would not drive the van.

Nevertheless, later that evening E.M. drove the van around the block with a friend, and upon their return drove the van into the family's garage. E.M. called Harrison and told him that "somebody pushed the car into the garage." Harrison then came over to the house for about two hours to look at the garage. An ambulance came, which E.M. said was requested by her friend. The ambulance personnel examined E.M. and found that she was not hurt.

E.M. called Turner around 7:00 p.m. and in a hysterical voice and said that she had run the van into the garage. Turner came to the house around 8:30 p.m. and found E.M. screaming, "I'm going to run away. My mom is going to kill me." Turner told E.M. to call her grandmother in New Orleans and her aunt Diana Jackson in Houston. E.M. called Shaqual and Jackson and told each of them about the accident. Shaqual called Jackson again and encouraged her to hurry up in getting to Mosley's house.[5]

4. Turner testified that she had been aware for a couple of months that Mosley was going to Africa and that Mosley had plans to care for her children while she was gone, but she did

not describe to the jury her understanding of Mosley's plans.

5. Although inconsistent with the timeline of events as set forth above, Shaqual also testi-

That night Mosley's oldest daughter, sixteen-year-old T.M., came to the house with her friend Joyce and Joyce's sister. During this time period, T.M. had not been living in the house, but she came to the house after Mosley's departure. She had been told by E.M. that Shaqual was at the house. T.M. saw the damage to the garage door and found that Shaqual was not at the house. At trial, T.M. did not explain why she did not stay at the house that night after finding out that Shaqual was not there. After Harrison left the house, Jackson and her children came over and spent the night.

### b. January 1

In the morning, Jackson left, T.M. returned, and E.M. called Shaqual in surprise that she had not arrived. E.M. testified that a friend of hers came over to the house and burned some food in a pot. She said there was plenty of food in the house, except there was no milk for the children's breakfast.

E.M. called Harrison, who came over and took her to the store to shop, along with three of the other children. They left one-year-old J.R. at home with T.M.'s friend Joyce. E.M. bought food with the money given to her by Mosley. Harrison never came in the house, and E.M. told him that Shaqual was there.

At some point during the day, E.M. drove everyone in Mosley's van to McDonald's to eat. T.M. testified that she knew that E.M. was not supposed to drive Mosley's van and that the children looked like they were in good health.

Turner spoke to E.M. around 10:00 a.m. and found out that neither Jackson nor Shaqual was at the house. Later that

morning, E.M. drove the van again to take Joyce to work. She later drove AA.M. and AN.M. to a party in the neighborhood. That afternoon, between five to ten of E.M.'s friends came over to the house. The age of her friends ranged from sixteen to nineteen, and E.M. admitted that Mosley would not have allowed that many children to be in the house.

When Shaqual did not show up at the house by the evening of January 1, E.M. was upset and called her. She again drove the van to pick up Joyce, and T.M. and Joyce spent the night at the house.

Mosley called home upon her arrival in Africa and quickly spoke to one of her children. She assumed that Shaqual was in Houston, but Mosley testified that she did not ask to speak to her. Shaqual, however, testified that she told Mosley on January 1 that she had never arrived at the house. Shaqual said that Mosley was "mad" during that call. She told Mosley not to worry and that she had called a cousin of theirs who was with the children. Shaqual later admitted that her telephone records did not show any calls between Mosley and her on January 1, 2008. There was one international call to Africa on January 2 when Shaqual spoke to Mosley.

### c. January 2

T.M. left the house around 3:00 a.m. on January 2. She expected Shaqual to arrive on the bus later that day. In the morning, E.M. drove Joyce to work before the other children woke up. She then drove the children to McDonald's after picking up Joyce, who was on a break. Sometime during the day, Harrison dropped his children off at the house before he went to work. That afternoon,

fied that she spoke with Mosley on the phone on December 31 after E.M. crashed the van

into the garage.

E.M. called Mosley using a calling card and told her, falsely, that Shaqual was at the house. Mosley asked to speak with the other children, and E.M. told her that they were at the store with Shaqual.

Late that afternoon, E.M. drove the van to give Joyce a ride from work, while the other children were at home with T.M. E.M. hit a car while she was driving to get Joyce. E.M. called Shaqual, Jackson, and Harrison about this incident. After E.M. dropped Joyce off, she drove home to find that law-enforcement officers were there. She initially testified that she called Mosley in Africa to tell her what had happened, but later denied this and said that she lied about it.

### D. The January 2 "welfare check"

Deputy A. Ortiz of the Harris County Sheriff's Department testified that she was sent to Mosley's house on January 2 at 7:30 p.m. for a "welfare check," which is an inquiry by law-enforcement personnel regarding a person's well being, such as an elderly or suicidal person. In this instance, the sheriff's department received a call from someone who believed that Mosley's children had been left alone. When she was dispatched, she was told the children were alone in the house and the mother had gone to Africa to get married.

Ortiz knocked on the front door and identified herself as a sheriff's deputy, but no one answered. She saw a silhouette of a child's head in an upstairs window, and she contacted Sergeant G. Rogers of the Harris County Sheriff's Department and continued to knock on the door and identify herself. After some time passed, T.M. opened the door, talking on a cell phone and apparently upset at Ortiz's presence.[6] Without stopping her phone conversation, T.M. allowed Ortiz to enter the house.

Ortiz gathered together all of the children as Rogers arrived. There were seven children in the house: all of Mosley's children except E.M., plus Harrison's two children. Rogers testified that the children's demeanor was fine, but they were all hungry.

Ortiz talked to the children and became concerned about one-year-old J.R., who she was not able to wake. Rogers was also concerned about J.R., who he described as listless and apparently dehydrated. Ortiz believed J.R. was not merely sleepy, so she asked that Emergency Medical Services come to the scene and examine him. She also asked another deputy to go buy food for the children, because it appeared to her they had not eaten since that morning. Rogers testified, "All the children were hungry. Every one of them were starving." When EMS personnel arrived, they gave Pedialyte to J.R., but he did not need intravenous fluids or hospitalization. EMS personnel examined all of the children, but did not take them to the hospital.

Rogers saw soot in the kitchen, indicating to him there had been a stovetop fire. He saw flour or baking soda on the stove, which he believed the children used to put out the fire. Based on his prior experience as a firefighter, Rogers estimated that the fire occurred from three days to a week before. He later admitted it was possible that Mosley had caused the fire before she left.[7]

---

6. T.M. testified that the first thing she did when she saw Ortiz was to call Shaqual and hide the children in a room. Shaqual testified that this phone call was the first time she knew that the children were at the house alone without Jackson. Shaqual told T.M. not to answer the door.

7. At trial, Mosley discussed a cooking fire she had that left dark spots on the ceiling, but she

While the other children were eating, E.M. arrived. E.M. appeared very upset and bothered that the deputies were at the house. Ortiz was eventually able to find out from E.M. that Mosley was in Africa. Ortiz asked both E.M. and T.M. if there were any adults that could be called to come over and stay with the children, but were told there was no one who lived locally. Most of the children's relatives lived in Louisiana. None of the children mentioned Diana Jackson or Sandra Turner as an adult who could be contacted.

Ortiz admitted that he did not check the children for injuries or bruises. Other than J.R.'s condition, Ortiz did not see anything that alarmed her about the children's physical condition. She determined that T.M. was speaking on the phone to her aunt, Diana Jackson, but she did not ask to speak to Jackson. She also did not ask E.M. if there were any adults who were supposed to be with the children while Mosley was gone. Ortiz made no attempt to contact either Mosley or Jackson, and she was the officer who contacted the district attorney's office to ask for charges to be brought against Mosley.

T.M. told Ortiz that she was staying with a friend because Mosley had kicked her out of the house three or four weeks earlier—something that Mosley denied at trial. E.M. told Ortiz that she was the person taking care of the younger children.

Rogers did not see a list of emergency-contact numbers left anywhere in the house, and he found only one working telephone. Rogers admitted that he did not check to see if emergency-contact numbers were stored on the telephone. He did not find any money, debit cards, or

any checks, but admitted that he did not ask the children if Mosley had left any money.

Harrison arrived at the house while the deputies were there. He told Rogers that he believed that Mosley had gone to Africa, but was not sure.

Around 11:30 p.m. an investigator for the Department of Family and Protective Services was called to go to Mosley's house and assist in transporting the children to the Child Protective Services office. Investigator P. Smith testified that the primary reason for taking the children into custody was because no adult was present. Smith took both the Mosley children and the Harrison children into CPS custody. She acknowledged that Harrison was present when she arrived.

Smith said that when she saw the children on January 2, they were dressed appropriately. She saw food in the house that the children could eat, such as canned goods, peanut butter, and food in the refrigerator. The only thing she did not see was milk in the refrigerator for J.R. She did not remember whether there was any canned milk in the pantry. Smith did not have a negative opinion about J.R.'s appearance or general health. She worked at the CPS office until approximately 4:00 or 5:00 a.m. to prepare required reports. During that time, no one came to pick up Mosley's children.

Sixteen-year-old T.M. later ran away from the CPS facility and called Mosley. She explained to her mother that Shaqual had never arrived, "everybody thought she had abandoned us," the children were in CPS custody, and Mosley "was in trouble" and needed to "get here as fast as you can."[8]

---

did not know what caused some other smoke damage in the kitchen.

**8.** On cross-examination, T.M. said that she first called Mosley on January 12, ten days after she was taken into CPS custody. T.M.

*E. Mosley's response to learning about the CPS intervention*

Shaqual testified that she told Mosley on January 3 that law enforcement had come out to her house and her children had been placed in CPS custody. Mosley, however, testified that she first learned her children were in CPS custody on January 6, when she received a call from T.M. after she had run away from CPS.

Mosley and her husband collected money from villagers to raise the approximately $200 needed to change the date of her February 16 return flight and return early to Houston. It took her approximately twelve days to find the money. She called family members in the United States and asked them to send her money, but no one would. Due to a late bus, Mosley missed the first flight home she rescheduled for January 17. The next flight she was able to schedule was on January 27. No one from law enforcement or CPS contacted her while she was in Africa, but Mosley called CPS and was told she would be arrested when she returned. Mosley testified that she was surprised Shaqual never arrived to take care of the children and that she would not have left for Africa if she had known that Shaqual was not coming.

*F. Harrison's January 4 telephone call*

A. Samuy, a CPS investigator employed by the Department of Family and Protective Services, was assigned to investigate the Harrison children. While she was at Harrison's house on January 4, she observed him receiving an international phone call. She testified that she saw the caller's thirteen-digit phone number, which began with "234." Harrison put the call on speakerphone, and Samuy heard the caller say she was "Monique," who Samuy said she recognized as Mosley. Samuy heard Mosley tell Harrison, "Do not talk to CPS," and "you know Shaqual was supposed to watch them children [because] you was supposed to pick her up from the bus station." Samuy also heard Mosley tell Harrison that she had left money for Shaqual's bus fare and to take care of the children while she was gone. The conversation lasted about five minutes, then the connection was lost.

Samuy testified that Harrison then told her he was calling Shaqual, and Harrison dialed a number and put the phone on speaker. Samuy heard a voice say, "This is Shaqual." Samuy testified that Shaqual went on to say the following:

> Monique knew I wasn't coming to Houston before she got on the plane because she didn't send me any money. She didn't send the bus money for me and my kids to come. She knew before she got on that plane that I wasn't going to be—I couldn't come to Houston. I don't know why she got on that plane.

Samuy admitted she did not know if Shaqual was being truthful, or if she was lying to cover up for lying to Mosley. Samuy believed that Harrison let her listen to the calls to demonstrate that he acted reasonably when he left Mosley's house on December 31, assuming that his children were being adequately supervised by Shaqual. Finally, Samuy admitted on cross-examination that both calls referred to a "Monique" and that she did not have any independent knowledge that Mosley went by the name "Monique."

The State asked Shaqual if she told Harrison on January 4 that "my sister knew I couldn't come because she did not send money. She knew I had not left. She was supposed to wire me money and she

---

said that Mosley's trip to Africa was supposed to be for two or three weeks, not six weeks.

She also denied telling Ortiz that Mosley had thrown her out of the house.

didn't." Shaqual responded, "I don't remember ever saying that."

### G. Shaqual's statement to Cara Bates

Cara Bates, a court appointed special advocate with Child Advocates, testified that she spoke with Shaqual in New Orleans on May 25, 2008 as part of the process of assessing relatives for placement of Mosley's children. Bates asked Shaqual what happened on December 31, and Shaqual told her she had been sent money for a bus ticket, but because the fares had increased for the holidays, the ticket was too expensive. Shaqual said that she called Mosley before she boarded her plane and told her that "she could not afford the bus ticket but would find some way 'over to Houston. But wasn't on her way yet." The conversation continued with Shaqual telling Mosley she tried to get a friend to drive her to Houston, but it did not work out and "she had no way to get to Houston."

Bates admitted that she relied solely on Shaqual's statements to her and that she had not seen any phone records. She said that Shaqual appeared to feel guilty that she was unable to get to Houston. Shaqual told her that Mosley never offered her any additional money for the bus.

### Analysis

### I. Admission of evidence

■ In her fifth point of error, Mosley contends the trial court erred in overruling her authentication objection to Samuy's testimony about a telephone conversation she heard on a speakerphone while she was at Harrison's house. This testimony was offered by the State to rebut Shaqual's prior testimony that she did not remember telling Harrison that Mosley knew Shaqual was not coming to Houston on December 31.

Samuy testified that Harrison dialed a number, put the call on speakerphone, and a person answered saying, "This is Shaqual." Mosley then specifically objected as follows, "Objection, Your Honor, unless she [Samuy] can authenticate Shaqual's voice I would object to her testifying to someone she doesn't know." The trial court immediately overruled the objection. Samuy then testified that the person on the phone said the following:

Monique knew I wasn't coming to Houston before she got on the plane because she didn't send me any money. She didn't send the bus money for me and my kids to come. She knew before she got on that plane that I wasn't going to be—I couldn't come to Houston. I don't know why she got on that plane.

Texas Rule of Evidence 901 provides for the authentication of telephone calls as follows:

**(a) General Provision.** The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

**(b) Illustrations.** By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

. . . .

(6) Telephone conversations. Telephone conversations, by evidence that a call was made to the number assigned at the time by the telephone company to a particular person or business, if:

(A) in the case of a person, circumstances, including self-identification, show the person answering to be the one called; or

(B) in the case of a business, the call was made to a place of business and the conversation related to busi-

ness reasonably transacted over the telephone.

. . . .

Here, the State offered testimony (1) of the number called and (2) that the person who answered identified herself as Shaqual. At trial, Mosley did not make a specific Rule 901 objection on the basis that the phone number offered by the State was not assigned to Shaqual. Instead, Mosley made an objection that Samuy was not able to authenticate Shaqual's voice.

While the State did not match all the elements of the illustration in Rule 901(b)(6)(A), Rule 901(b) specifically provides that the illustrations do not limit the general provision in Rule 901(a): "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Although the State did not show that the call "was made to the number assigned at the time by the telephone company to a particular person," that alone does not foreclose authentication on other grounds.

▮ Alternate grounds to authenticate the identity of a telephone caller include self-identification of the caller coupled with additional evidence such as the context and timing of the telephone call, the contents of the statement challenged, internal patterns and other distinctive characteristics, and disclosure of knowledge and facts known peculiarly to the caller. *See, e.g., Manemann v. State,* 878 S.W.2d 334, 338 (Tex.App.-Austin 1994, pet. ref'd) (citing *United States v. Orozco–Santillan,* 903 F.2d 1262, 1266 (9th Cir.1990); *United States v. Miller,* 771 F.2d 1219, 1234 (9th Cir.1985); and Tex.R.Crim. Evid. 901(b)(4), (5), (6), 11 Tex. Reg. 565 (Tex. Crim.App.1985) (former Texas Rule of Criminal Evidence 901, since repealed by

current Texas Rules of Evidence)). Here, Samuy testified that the person on the phone identified herself as Shaqual and continued to disclose information that was very specific to circumstances previously described by Shaqual and Mosley.

We hold that the trial court did not abuse its discretion in admitting Samuy's testimony because there was sufficient evidence before the trial court to support a finding that person on the telephone was Shaqual. *See* TEX.R. EVID. 901(a); *see also Guzman v. State,* 955 S.W.2d 85, 89 (Tex.Crim.App.1997) (discussing abuse-of-discretion standard in review of evidentiary rulings); *Montgomery v. State,* 810 S.W.2d 372, 378–80 (Tex.Crim.App.1990) (same). The trial court's ruling that the evidence was admissible, of course, did not preclude Mosley from challenging its weight and credibility.

We overrule the fifth point of error.

## II. Sufficiency of the evidence

In her first four points of error, Mosley contends the evidence is legally and factually insufficient to establish that she intended to abandon the children and that she left the children under circumstances that exposed them to an unreasonable risk of harm. Mosley grouped these arguments together and did not make separate arguments for her legal and factual sufficiency points.

▮ Penal Code section 22.041 provides in part:

(a) In this section, "abandon" means to leave a child in any place without providing reasonable and necessary care for the child, under circumstances under which no reasonable, similarly situated adult would leave a child of that age and ability.

(b) A person commits an offense if, having custody, care, or control of a

child younger than 15 years, he intentionally abandons the child in any place under circumstances that expose the child to an unreasonable risk of harm. TEX. PENAL CODE ANN. § 22.041(a), (b) (Vernon Supp. 2009). When an appellate court decides a case without issuing a majority opinion providing a single rationale explaining the result, the majority holding is the position taken by those members who concurred in the judgment on the narrowest grounds. *Haynes v. State*, 273 S.W.3d 183, 186 (Tex.Crim.App. 2008). A majority of the Court of Criminal Appeals has interpreted section 22.041 to mean that the prescribed mental state—intentional—is connected with the act of abandonment. *See Schultz v. State*, 923 S.W.2d 1, 2–4 (Tex.Crim.App.1996) (plurality op.); *id.* at 4–5 (Maloney & Mansfield, JJ., concurring). To meet this culpable mental state, the defendant must intentionally leave a child in any place without providing reasonable and necessary care for the child. TEX. PENAL CODE ANN. § 22.041(a); *Schultz*, 923 S.W.2d at 2–4 (plurality op.); *id.* at 4–5 (Maloney & Mansfield, JJ., concurring). Additionally, the defendant must know that the circumstances are such that no reasonable, similarly situated adult would leave a child of that age and ability. TEX. PENAL CODE ANN. § 22.041(a); *Schultz*, 923 S.W.2d at 2–4 (plurality op.), 4–5 (Maloney & Mansfield, JJ., concurring). However, the evidence need not show that the defendant actually knew that the circumstances would expose the child to an unreasonable risk of harm. *See Schultz*, 923 S.W.2d at 2–4 & n. 6 (plurality op.), 4–5 (Maloney & Mansfield, JJ., concurring). As noted by the *Schultz* plurality, "[t]his construction appears designed to punish actors who are aware of the dangerous circumstances even though, due to shortsightedness, lack of common sense, apathy, or just plain stupidity, they may not be aware that the circumstances are dangerous." *Schultz*, 923 S.W.2d at 4 n. 6 (plurality op.).

The standard of review for sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979); *Brooks v. State*, 323 S.W.3d 893, 902 (plurality op.), 926 (Cochran, J., concurring) (Tex.Crim.App.2010).[9] The jury is the exclusive judge of the facts. TEX.CRIM. PROC. CODE ANN. art. 36.13 (Vernon 2007), art. 38.04 (Vernon 1979); *Brooks*, 323 S.W.3d at 893, 908. Accordingly, "[a]ppellate courts should afford almost complete def-

9. *Brooks* was decided by the Court of Criminal Appeals after our original opinion in this case issued, but before our plenary power to revise the opinion expired. *See* TEX R.APP. P. 50. Our conclusion that the evidence was sufficient has not changed, and Mosley does not suggest in her petition for discretionary review that *Brooks* should change our analysis. However, in light of our decision to revise this opinion on other grounds, we find it appropriate to also revise our analysis of the sufficiency of the evidence to apply the *Jackson v. Virginia* standard to Mosley's factual-sufficiency points. *See Brooks*, 323 S.W.3d at 902 (plurality op.) ("There is ... no meaningful distinction between the *Jackson v. Vir-*

*ginia* legal-sufficiency standard and the *Clewis* [*v. State*, 922 S.W.2d 126 (Tex.Crim.App. 1996)] factual-sufficiency standard, and these two standards have become indistinguishable."), 915 ("If the evidence suffices to prove guilt beyond a reasonable doubt, and it supports a rational, reasonable verdict, as required under *Jackson*, that evidence cannot logically be so lacking in probative value as to make the jury's verdict 'manifestly unjust' under the vague and subjective civil-law factual-sufficiency standard.") (Cochran, J., concurring). *See generally Taylor v. State*, 10 S.W.3d 673, 677–83 (Tex.Crim.App.2000) (discussing retroactive application of new rules).

erence to a jury's decision when that decision is based upon an evaluation of credibility." *Lancon v. State,* 253 S.W.3d 699, 705 (Tex.Crim.App.2008). "The jury is in the best position to judge the credibility of a witness because it is present to hear the testimony, as opposed to an appellate court who relies on the cold record." *Id.*

### a. Intent to abandon

■ Mosley contends that the evidence is insufficient to prove that she intended to abandon her children. As noted above, to "abandon" in this context means "to leave a child in any place without providing reasonable and necessary care for the child, under circumstances under which no reasonable, similarly situated adult would leave a child of that age and ability." TEX. PENAL CODE ANN. § 22.041(a) (Vernon Supp. 2009). In this regard, Mosley suggests that reasonable adults routinely leave their children supervised by a teenager. That common-sense notion cannot immunize Mosley's conduct as a matter of law. Leaving four children under the age of ten for six weeks without adult supervision and under the supervision of a fifteen-year-old child who is on juvenile probation is an entirely different proposition than hiring a babysitter for the evening. Many appellate cases have discussed the offense of abandoning a child, and we consider three with analogous circumstances. *See Schultz v. State,* 879 S.W.2d 377 (Tex.App.-Amarillo 1994), *aff'd,* 923 S.W.2d 1 (Tex.Crim.App.1996); *Castillo v. State,* No. 08–04–00377–CR, 2006 WL 1710062 (Tex.App.-El Paso June 22, 2006, no pet.) (not designated for publication); *Cochener v. State,* No. 14–91–00153–CR, 1992 WL 105768 (Tex.App.-Houston [14th Dist.] May 21, 1992, no pet.) (not designated for publication).

In *Cochener v. State,* the defendant was convicted of abandoning her four-year-old daughter when the defendant left the child unattended in a car while she went shopping. The defendant brought a legal-sufficiency challenge, claiming that the State "failed to refute her allegation that the child was competent to supervise herself." 1992 WL 105768, at *2. She also contended that she did not abandon her four-year-old child because she left the child in the care of her "capable twelve-year-old son." *Id.* The Fourteenth Court rejected both of these arguments, stating, "The jury was entitled to believe that a reasonable, similarly situated adult would not permit a twelve-year-old to be solely responsible for the care of a younger sibling for *any* period of time without some parental supervision." *Id.*

In *Schultz v. State,* the defendant was convicted of abandoning her nine-year-old daughter when the defendant left her and an eleven-year-old nephew at home from noon until 3:30 a.m. the next day. 879 S.W.2d at 378. The defendant did call the children periodically on the phone, but tragically both the daughter and nephew were killed in a fire while the defendant was gone. *See id.* at 378, 380–81. The defendant argued on appeal that because of her phone calls, the evidence was legally insufficient to show that she was aware of, but consciously disregarded, a substantial, unjustifiable, unreasonable risk of the children's death by fire. *Id.* at 380. The Court of Criminal Appeals explained that "abandoning" a child is not the same as "leaving" a child:

> Appellant mistakenly believes that this interpretation of the statute punishes her actions without regard to the surrounding circumstances. On the contrary, by intentionally "abandoning" a child, the actor does more than merely intentionally "leave" the child. The actor intentionally leaves the child *under a certain set of objectively unreasonable circumstances* outlined in the definition

of "abandons." This construction appears designed to punish actors who are aware of the dangerous circumstances even though, due to shortsightedness, lack of common sense, apathy, or just plain stupidity, they may not be aware that the circumstances are dangerous. *Schultz*, 923 S.W.2d at 4 n. 6.

Finally, in *Castillo v. State*, the defendant left her six-year-old son, eight-year-old son, and eleven-year-old daughter alone at home overnight beginning at approximately 7:00 p.m. 2006 WL 1710062, at \*2–3. The defendant had an adult friend who was staying at the house, but she was not able to talk to him and tell him that she would not be coming home. *Id.* at \*2. There was conflicting evidence whether the defendant left the children alone that night or with the roommate. *Id.* at \*4. The El Paso court held the evidence of the defendant's fourteen-hour absence was legally and factually sufficient to prove the defendant left the three children without providing reasonable and necessary care and that a reasonable and similarly situated adult would not have left the children there overnight. *Id.* at \*4.

Viewed in the light most favorable to the verdicts, the evidence shows that Mosley planned to be out of the country from December 31, 2007 to February 16, 2008. Mosley's plan for taking care of her children while she was gone was for her sister Shaqual to come to Houston and stay with the children. The only evidence of a backup plan if Shaqual did not arrive was Mosley's statement that Harrison would take care of the children "while [Shaqual] wasn't there," which the jury was entitled to disbelieve. *See Margraves v. State*, 34 S.W.3d 912, 919 (Tex.Crim.App.2000). The record shows that Jackson did spend one night at the house and that sixteen-year-old T.M. was present at times to assist E.M. The record, however, fails to show that other than this intermittent assistance to E.M., there was any plan for Jackson or T.M. to commit to caring for the four young children. Mosley boarded her plane knowing that her sister Shaqual had not arrived at the house to care for her children, and there is evidence in the record that Shaqual told Mosley that she had no way to get to Houston. This left E.M., a teenager on juvenile probation, with no adult supervision and in charge of the complainants, one-year-old J.R. and eight-year-old AA.M., as well as seven-year-old Z.M. and nine-year-old AN.M. On this record we conclude that a rational trier of fact could have found beyond a reasonable doubt that Mosley intentionally abandoned her children by leaving them at home without providing for their reasonable and necessary care. Additionally, the evidence is sufficient to show that Mosley knew that the circumstances were such that no reasonable similarly situated adult would leave children of the same age and ability. *See Cochener*, 1992 WL 105768, at \*2.

### b. Circumstances of exposure to unreasonable risk of harm

■ Mosley also contends that the evidence is insufficient to prove that she exposed her children to an unreasonable risk of harm. In *Castillo*, a mother had left three children at home overnight, and the court held the evidence was legally and factually sufficient to prove the defendant abandoned the children under circumstances that exposed them to an unreasonable risk of harm. 2006 WL 1710062, at \*5. Although nothing bad happened, the court pointed out that any of the children could have been injured or fallen ill during the defendant's fourteen-hour absence and there was evidence that the children did not have adequate food available to them. *Id.* at \*5.

In this case, Mosley argues that she arranged for Shaqual to take care of the children and that she did not know Shaqual was not on her way to Houston at the time Mosley boarded her plane. Mosley points out that Jackson did come over to stay with the children one night and Harrison was at the house when law-enforcement officers came to the house. There is conflicting evidence in the record concerning whether Mosley thought her sister Shaqual was on her way to Houston to take care of the children. There is also conflicting evidence in the record as to whether Mosley left sufficient money and food in the house to provide for the children while she was gone for six weeks. Mosley does not argue, however, that Jackson, Harrison, or some other adult had committed to supervising the children if Shaqual was not able to take care of them.

Viewed in the light most favorable to the verdicts, the evidence in this case shows Mosley did not leave sufficient money to provide for the children during her planned six-week absence. Mosley testified she gave no more than $2,000 in cash to E.M., and the evidence was inconsistent as to whether even that much money had been left. E.M. said she had access to credit or debit cards, but that Mosley had not left her instructions on how to use them. The evidence showed that E.M. had unsuccessfully attempted to obtain cash with a debit card to buy groceries, which the jury could have concluded was inconsistent with Mosley's testimony that she had given her $2,000.

Finally, and again viewed in the light most favorable to the verdicts, the evidence shows that although food was in the pantry on January 2, it had not been served to the young children who, at 7:30 p.m., apparently had not eaten since that morning when the sheriff's department found them at the house. The one-year-old baby could not nourish himself by taking food from the pantry; the food needed to be prepared and served to him at regular intervals. The baby appeared listless and dehydrated. Based on this evidence, the jury could have concluded that the baby had not been fed.

We hold there is sufficient evidence from which the jury could find that Mosley abandoned the children under circumstances that exposed them to an unreasonable risk of harm. As the *Castillo* court held in similar circumstances, we also hold that because Mosley's children could have been injured or fallen ill during her absence and there was evidence that the children did not have adequate food available to them, there is sufficient evidence from which the jury could find that Mosley abandoned them under circumstances that exposed them to an unreasonable risk of harm. *See Castillo*, 2006 WL 1710062, at *2–3.

We overrule the first four points of error.

### Conclusion

We affirm the trial court's judgments.

Justice JENNINGS concurring in the judgments.

TERRY JENNINGS, Justice, concurring.

I concur in the judgments of this Court, but write separately to explain why I do so in regard to the questions of fact presented to this Court by appellant, Shanell Monique Mosley, in light of my recent concurring opinion in *Ervin v. State*, 331 S.W.3d 49, 56–70 (Tex.App.-Houston [1st Dist.] 2010, no pet. h.) (Jennings, J., concurring).

In her second and fourth issues, appellant, citing *Johnson v. State*, 23 S.W.3d 1 (Tex.Crim.App.2000), argues that the evi-

dence, when viewed *not in the light most favorable to the prosecution,* but when viewed neutrally, is factually insufficient to support her conviction for abandoning her children[1] because that evidence is "so weak that it makes the jury's verdict clearly wrong and unjust" or "the finding of guilt is against the great weight and preponderance of the evidence."

As the Texas Court of Criminal Appeals clearly explained as recently as 2009, in addition to being supported by legally sufficient evidence, under Texas law,

> A verdict must also be supported by factually sufficient evidence. But *unlike a legal sufficiency review,* which is a federal due process requirement, *a factual sufficiency review is a creature of state law* .... On direct appeal, *a court must begin its factual sufficiency review with the assumption that the evidence is legally sufficient under Jackson.* Evidence that is legally sufficient, however, can be deemed factually insufficient in two ways: (1) the evidence supporting the conviction is "too weak" to support the factfinder's verdict, or (2) considering conflicting evidence, the factfinder's verdict is "against the great weight and preponderance of the evidence." ...
> When a court of appeals conducts a factual sufficiency review, it must defer to the jury's findings.... We have set out three "basic ground rules" implementing this standard.... First, *the court of appeals must consider all of the evidence in a neutral light,* ... *as opposed to in a light most favorable to the verdict* .... Second, the court of appeals may only find the evidence factually insufficient when necessary to "prevent manifest injustice." ... *Although the verdict is afforded less deference during a factual sufficiency review, the court of appeals is not free to override the verdict*

> *simply because it disagrees with it* ....
> Third, the court of appeals must explain why the evidence is too weak to support the verdict or why the conflicting evidence greatly weighs against the verdict.... This requirement serves two related purposes. First, it supports the court of appeals's judgment that a manifest injustice has occurred.... And second, it assists us in ensuring that the standard of review was properly applied.

*Laster v. State,* 275 S.W.3d 512, 518 (Tex. Crim.App.2009) (Keasler, J., joined by Keller, P.J., Meyers, Womack, and Hervey, JJ.) (emphasis added) (citations omitted).

In fact, in 2005, on a direct appeal to the court of criminal appeals of a death-penalty capital murder conviction, the court itself conducted a factual-sufficiency review of the evidence and reversed the conviction, which was based on the law of parties. *Vodochodsky v. State,* 158 S.W.3d 502, 511 (Tex.Crim.App.2005). In remanding the case, which involved the murder of three peace officers, for a new trial, Judge Keasler, writing for the majority, neutrally weighed the evidence and explained:

> In this case, the overwhelming *weight of the evidence* mitigates against the conclusion that Vodochodsky solicited, encouraged, directed, aided or attempted to aid [the principal actor] in committing the offense. *All of the evidence that could legally support a rational jury's conclusion is nevertheless so weak that our confidence in the jury's verdict is undermined.* Although there was some evidence of a second shooter on the roof, this was not established. While Vodochodsky's statements were inconsistent, the inconsistencies were minor. When [the principal actor] expressed a desire to "do it right now" and Vodochodsky told him they did not yet have a plan,

---

1. *See* TEX. PENAL CODE ANN. § 22.041     (Vernon 2010).

neither man specifically mentioned killing a peace officer. When Vodochodsky told [another] that he bailed [the principal actor] out of jail "to do this," he did not specifically state that he bailed him out as part of a plan to kill police officers. Vodochodsky removed belongings from the house, but there is no proof that he did so as part of a murderous plot. And Vodochodsky's comment to [the other] that [the principal actor] had "gone over the edge" when he took [a] deputy's gun could just as reasonably have been a speculative comment, not one indicating that Vodochodsky had witnessed [the murder of one of the officers].

> Indeed, none of that evidence necessarily suggests that Vodochodsky acted with intent to promote or assist [the principal actor]. None of his statements directly refer to killing police officers. His statements are devoid of information on the details of the alleged murder plot, and there is no other information in the record suggesting that Vodochodsky was planning the event with [the principal actor].

Furthermore, other evidence suggests that Vodochodsky was not working with [the principal actor]. His whispered warning to [a witness] could indicate that while he may have known of [the principal actor]'s plan, he was not a party to it. He did not participate in the purchase of ammunition. There is no evidence that Vodochodsky actually did any affirmative act to assist [the principal actor] with the plan. Instead, Vodochodsky had the bad luck of being the friend and roommate of a man determined to kill police officers and himself. We conclude that proof of Vodochodsky's guilt *was so weak as to undermine confidence in the jury's determination.* This evidence was *factually insufficient*

to convict. Point of error two is sustained.

> We reverse the judgment of the trial court and *remand this case* for Vodochodsky to answer the charges in the indictment.

*Id.* at 510–11 (emphasis added) (citations omitted).

In regard to appellate challenges based on the factual insufficiency of the evidence in Texas courts of appeals, the factual-conclusivity clause of the Texas Constitution provides in no uncertain terms that:

> [T]he decision of [Texas Courts of Appeals] shall be *conclusive* on all questions of fact brought before them on appeal or error.

TEX. CONST. art. V, § 6(a) (emphasis added). The original intent of the drafters of the clause is clear. The clause "requires" that Texas courts make a "distinction" between questions of law and questions of fact. *Sw. Bell Tel. Co. v. Garza,* 164 S.W.3d 607, 621 (Tex.2004). As clearly explained, again by the court of criminal appeals, in *Laster,*

> Unlike our jurisdiction over legal sufficiency decisions, *our jurisdiction over the court of appeals's factual sufficiency decisions is limited* .... The Factual Conclusivity Clause *gives final appellate jurisdiction to the court of appeals on questions of fact* brought before the court.... We review the court of appeals's factual sufficiency analysis *to ensure that the court applied the correct legal standard and considered all of the relevant evidence* .... We do not conduct a de novo factual sufficiency review.... If we determine that the court of appeals applied the wrong standard or misapplied the correct standard, the case must be remanded to the court of appeals to conduct a proper factual sufficiency review.

275 S.W.3d at 518–19 (emphasis added) (citations omitted).

Thus, under the factual-conclusivity clause, this Court has a duty to address appellant's question of fact as a question of fact, i.e., by neutrally considering and weighing all the evidence in the record, including that which is contrary to the jury's verdict. *Id.; Cain v. State,* 958 S.W.2d 404, 408 (Tex.Crim.App.1997); *Ex parte Schuessler,* 846 S.W.2d 850, 852 (Tex.Crim.App.1993); *Meraz v. State,* 785 S.W.2d 146, 153 (Tex.Crim.App.1990); *see also Pool v. Ford Motor Co.,* 715 S.W.2d 629, 633–35 (Tex.1986); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951). Moreover, the Texas Legislature has expressly directed, consistent with the factual-conclusivity clause, that Texas courts of appeals "may reverse the judgment in a criminal action ... upon the facts." TEX.CODE CRIM. PROC. ANN. art. 44.25 (Vernon 2006) (entitled, "Cases Remanded"). Indeed, it is reversible error for a court of appeals to address a question of fact as a question of law. *In re King's Estate,* 244 S.W.2d at 661–62; *Ex parte Schuessler,* 846 S.W.2d at 852; *Meraz,* 785 S.W.2d at 153.

Regardless, five judges on the court of criminal appeals, in two separate opinions, have recently concluded that in criminal cases "a legal-sufficiency [appellate] standard [of review] is 'indistinguishable' from a factual-sufficiency [appellate] standard" of review. *Brooks v. State,* 323 S.W.3d 893, 901 (Tex.Crim.App.2010) (Hervey, J., joined by Keller, J., Keasler, J., and Cochran, J.); *see id.* at 912–26 (Cochran, J., joined by Womack, J., concurring) (overruling use in criminal cases of factual-sufficiency appellate standard of review, which was consistent with Texas Supreme Court precedent and articulated in *Clewis v. State,* 922 S.W.2d 126, 134–36 (Tex. Crim.App.1996)). The five judges purport to substitute a legal-sufficiency appellate standard of review in place of a factual-sufficiency appellate standard of review. *Brooks,* 323 S.W.3d at 895 (holding that legal-sufficiency standard articulated in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) is "only standard" reviewing court should apply in determining whether evidence is sufficient to support each element of criminal offense). Asserting that the "two standards *have become* essentially the same standard and that there is no meaningful distinction between them that would justify *retaining them both,*" the five judges purport to eliminate from Texas's criminal jurisprudence the factual-sufficiency appellate standard of review. *Id.* (emphasis added).

The effect of this, which was not addressed by the five-judge majority in either of their opinions, would be to prohibit Texas courts of appeals in criminal cases from actually deciding questions of fact, which by their very nature require a Texas court of appeals to consider and weigh all the evidence in a trial record, and, if appropriate, reverse the judgment of a trial court and remand for a new trial as was done by the court of criminal appeals in *Vodochodsky.* It would confine the courts of appeals to addressing the purely legal question of whether the evidence, *when not weighed,* but rather *when viewed in the light most favorable to the prosecution,* is legally sufficient to support a criminal conviction. Thus, it would render the factual-conclusivity clause of the Texas Constitution and article 44.25 of the Texas Code of Criminal Procedure dead letters in criminal appeals.

Simply put, the court of criminal appeals has neither the jurisdiction nor any lawful authority to do this. In fact, three years prior to issuing its opinion in *Clewis,* the court itself acknowledged that it simply may not order Texas courts of appeals to use a legal-sufficiency appellate standard of review to decide the questions of fact

brought before them on appeal. *Ex parte Schuessler*, 846 S.W.2d at 852. Recognizing that it may not "interfere[ ] with the fact jurisdiction of the intermediate appellate courts," the court emphasized that it is "not constitutionally authorized to adopt a standard of review for the court[s] of appeals ... *inconsistent* with Art. V, § 6 of [the Texas] Constitution." *Id.* at 853 (emphasis added) (quoting *Meraz*, 785 S.W.2d at 153). Any such action taken by the court of criminal appeals is, in its own words, "void *ab initio.*" *Ex parte Schuessler*, 846 S.W.2d at 853.

In regard to the plurality and concurring opinions in *Brooks*, it is true that under the doctrine of stare decisis that once "the highest court of the State *having jurisdiction*" of a matter decides a "principle, rule or proposition of law," that court and all "other courts of *lower rank* " must accept the decision as "binding precedent." *Swilley v. McCain*, 374 S.W.2d 871, 875 (Tex.1964) (emphasis added). It is also true that the court of criminal appeals has final appellate jurisdiction on all questions of law in criminal cases. TEX. CONST. art. V, § 5. However, only four of the five court of criminal appeals judges who would substitute the *Jackson* legal-sufficiency standard for a factual-sufficiency standard purport to do so under Article V, section 5 of the Texas Constitution. *Brooks*, 323 S.W.3d at 912 (Hervey, J.).

More importantly, under the factual-conclusivity clause, a Texas court of appeals, in regard to its decisions on the questions of fact presented to it, is not a court of rank "lower" than either the supreme court or the court of criminal appeals because the courts of appeals have conclusive, exclusive, and final authority over such questions of fact. As recognized by the court of criminal appeals, the factual-conclusivity clause gives "final appellate jurisdiction to the courts of appeals on questions of fact brought before" them.

*Laster*, 275 S.W.3d at 518. Under the clause, the court of criminal appeals' jurisdiction on questions of fact is "limited" to ensuring that a court of appeals has answered a question of fact as a question of fact. *Id.* And neither the supreme court nor the court of criminal appeals has any jurisdiction to create a factual-sufficiency appellate standard of review "in conflict" with the Texas Constitution, i.e., any standard that would eliminate or in any way interfere with the exclusive authority of the courts of appeals to actually decide the questions of fact presented to them by considering and weighing all the evidence in a trial record. *Ex parte Schuessler*, 846 S.W.2d at 852–53; *Meraz*, 785 S.W.2d at 152; *see also Pool*, 715 S.W.2d at 633–35; *In re King's Estate*, 244 S.W.2d at 661–62. Thus, the doctrine of stare decisis does not bind a Texas court of appeals to apply such an invalid, unconstitutional, appellate standard of review.

After further consideration of the instant case, I have grave doubts that the evidence, when viewed neutrally and weighed, as was done in *Vodochodsky*, and not viewed only in the light most favorable to the prosecution, is factually sufficient to support appellant's conviction. Nevertheless, the majority in *Ervin* decided to answer Ervin's question of fact as a question of law by applying the *Jackson* legal-sufficiency appellate standard of review and viewing the evidence in the light most favorable to the prosecution. Although the majority erred in doing so, this Court did have jurisdiction to so err, and, unless this Court subsequently overrules *Ervin*, we must accept *Ervin* as binding precedent. *Swilley*, 374 S.W.2d at 875.

Accordingly, I concur in the judgments of this Court.