

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| ARMANDO MARTINEZ, | § | No.08-19-00046-CR |
| Appellant, | § | Appeal from the |
| v. | § | 409th District Court |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC#20160D04459) |

**O P I N I O N**

A jury convicted Armando Martinez ("Martinez") of attempted murder. After hearing evidence of Martinez's lengthy criminal history, including two felony convictions used to enhance his punishment, the same jury assessed punishment at life in prison. Martinez contends, during both guilt and punishment phases of trial, the trial court erred during both guilt and punishment phases of trial by admitting into evidence jail call recordings containing incriminating statements attributed to Martinez while he was in custody awaiting trial. Finding no error, we affirm.

**Factual Background**

On July 28, 2016, Martinez (a.k.a. "Gizmo"), Jose Luis Chavez ("Chavez" a.k.a. "Fat Cat"), and Robert Young ("Young" a.k.a. "Toro") smoked methamphetamine and marijuana together at Young's house. According to Young, at approximately 10:30 or 11:00 p.m. Martinez

picked a fight with Chavez, who Martinez had just met. While the two wrestled, Martinez stabbed Chavez multiple times with a knife. After the stabbing, Martinez quickly left the house on foot and Young took Chavez to the hospital. Medical records indicated Chavez was stabbed four times, once in the left pectoral area, twice in his left flank and once on his right forearm.

While at the hospital, Young made contact with El Paso Police Gang Unit Officer Lionel Gutierrez and gave a verbal statement explaining what happened, but used an alias to identify Chavez, who had an active warrant for his arrest. Young also initially told Gutierrez that Chavez was stabbed before arriving at Young's home. Young eventually provided the police accurate information regarding Chavez's identity and the location of the stabbing while at the hospital.

At the officer's request, Young led Gutierrez, who traveled in a separate vehicle, from the hospital to Martinez's residence. Officer Gutierrez did not make contact with Martinez at that time. Instead, Young was instructed to follow Gutierrez to the police station where Young provided a written statement implicating Martinez in the stabbing and identified Martinez in a photo line-up.

The next morning on July 29, 2016, Martinez was arrested at his residence pursuant to an outstanding warrant[1] and taken to the police station, where he gave a voluntary statement, which was recorded on video. In his video statement, Martinez admitted to being with Chavez at Young's residence the night before, but claimed he left at 9:30 p.m. without incident. Meanwhile, a search warrant was executed at Martinez's residence. Blood stains were found on a pair of shoes located in Martinez's residence. Samples of DNA were obtained from both Chavez and Martinez and compared to the DNA collected from the shoes. Chavez's DNA was consistent with DNA found on the shoes retrieved from Martinez's residence.

---

[1] At the time Martinez committed this offense, he was on probation for a previous offense.

On September 14, 2017, a bond order was issued setting bail at $200,000 corporate surety and $100,000 personal recognizance. A condition of the bond required Martinez to "not come within 200 ft." of Chavez. However, Martinez remained in custody. On October 30, 2017, a motion to reduce the bail amount was filed. A bond hearing was held on November 30, 2017 and a new bond order was issued setting bail at $10,000 corporate surety and $40,000 personal recognizance. The box containing the general condition that Martinez stay away from the victim was checked, but Chavez's name was not written in the order. On December 1, 2017, Martinez was released from custody, pending trial.

On April 26, 2018, the State filed a Notice of Defendant's Extraneous Offenses informing Martinez of the State's intent to use evidence of other crimes, wrongs and other acts during both guilt and punishment phases of trial. The notice referenced several telephone calls Martinez made from jail between December 23, 2016 and September 25, 2017 to his relatives, including his wife Annette Chavez. The jail calls were recorded and the recordings contained several incriminating statements made by Martinez about both the crime for which he was charged and other acts of violence he committed against other inmates while in custody.

One phone call, made on December 27, 2016, captured Martinez telling his wife the State was not offering a plea deal and he was afraid to go to trial because "they give you high numbers" at trial, and he "was not entirely innocent." Another call made on September 7, 2017 to his wife captured Martinez making the following statements:

> I found that fool Fat Cat. He's in here. . . . I ran into his fu\*\*ing bitch ass in the clinic the other day. . . yeah he got locked up . . . he was here, when I went to the clinic I seen him . . . what the fu\*\* you looking at me fool, fu\*\*er do I owe you something or what? And he goes where are you from, ese? Que he's from northeast . . . and I go you're from northeast? . . . He says . . . I am Fat Cat . . . I put my hands to my face and what's up fool I said what's up fool? What the fu\*\* you being a fu\*\*ing snitch for? What's up home boy? Na na na na . . . it wasn't me it was the

other fool, it was Toro. Come on man if you know I got the fu**ing indictment it's got your name on it . . . I read the fu**ing statement, what you said. But you know what, man . . . I'm gonna give you a chance, fool. Just like that . . . I am going to give you this chance. Him, you and that other fool slide on back. If you guys sign a non-prosecution statement and leave that sh** alone and we're good. You know? And he is like, 'I didn't say nothing bro I didn't say nothing bro you gotta give me that much man that I told them I didn't know who it was' and this and that. And the thing is that you said something period . . . you should have just said nothing at all, you know what I mean? . . . I don't want to say too much on the phone, but hay lo traigo en la mira[2] you know what I mean? . . . and really if they don't have a victim, they don't have sh** you know what I mean?

On August 2, 2018, the State filed a motion to revoke Martinez's bond. The motion relied in part on the fact that on "September 2017 [Martinez] tampered with, influenced and threatened the victim Jose Luis Chavez . . . called the victim a 'fu**ing snitch' and advised him he would give him a chance 'to clean his sh**' if he signed a non-prosecution statement and leave that sh** alone." The motion also alleged Martinez failed to report on one occasion and tested positive for methamphetamine on July 26, 2018. The State's motion was granted and Martinez's bond was revoked on August 3, 2018. On October 9, 2018, Chavez died of a drug overdose.

**Trial--Guilt/Innocence**

Trial began on January 7, 2019. During the State's case-in-chief, in addition to the evidence establishing the facts set out above, the prosecutor offered into evidence the recordings of the jail calls Martinez made to his wife Annette on December 27, 2016 and September 7, 2017. Martinez objected to admission of the evidence on the ground that Rule 403 of the Texas Rules of Evidence prohibited admission of the recordings because their prejudicial effect outweighed their probative value. The trial court overruled the objection and admitted the recordings into evidence.

In his case-in-chief, Martinez presented a single witness--a DNA expert who criticized the

---

[2]  Translation: "I have it in my sights."

State's DNA expert for failing to confirm that the substance found on Martinez's shoes was in fact blood instead of some other substance. During closing arguments at guilt/innocence, defense counsel argued that Young was not a credible witness, the DNA evidence was unreliable, the State failed to prove Martinez had intent to kill, and failed to prove with reliable evidence that Martinez stabbed Chavez beyond a reasonable doubt. During the prosecutor's closing arguments, in addition to summarizing the eyewitness testimony offered by Young, the DNA evidence, and Martinez's admissions made in this voluntary video statement, the prosecutor played the jail call recordings six times. The jury found Martinez guilty of attempted murder.

**Trial--Punishment**

During punishment, the State introduced evidence of Martinez's extensive criminal history including a prior conviction for aggravated assault with a deadly weapon-an offense that resulted in the victim's death when Martinez was only fourteen years' old. Martinez's judgments of conviction for retaliating against an El Paso County Sheriff's Deputy, assault, family violence assault, drug possession, terroristic threat, and unauthorized use of a vehicle were also offered and admitted into evidence.

The State also offered into evidence two additional jail call recordings in which Martinez admitted he had assaulted an inmate while in custody and made statements identifying himself as a member of the Mexican Mafia. Martinez objected to the admission of these jail call recordings on the ground that the "proper predicate had not been laid" because the sponsoring witness could not identify the voices in the recordings. The trial court overruled the objection and admitted the two additional jail recordings into evidence.

The State also introduced testimony from Robert Ontiveros, Jr., an El Paso Police Officer assigned to the Organized Crime Division, establishing that Martinez was a confirmed Texas

Mafia[3] gang member. Finally, the State introduced testimony from Chavez's sister, who explained how the stabbing affected Chavez's quality of life prior to his death.

Martinez presented two witnesses during punishment, his father and himself. Martinez's father testified in part that Martinez had obtained a certificate of completion as a diesel mechanic from El Paso Community College in 2013, Martinez was "a good person," who loved his daughter, and asked the jury to show compassion when assessing punishment.

In addition, against the advice of his attorney, Martinez testified on his own behalf. He said he was thirty-seven years' old, and had a four-year-old daughter. He said he attended school until the eighth grade and that his rebelliousness started at age eleven. He said while living on the streets, he was taught to defend himself and to "stand up to opposing peers in violent fashions." When he was fourteen, he and three others, were charged with murder, but, due to his age, he was permitted to plead guilty to aggravated assault, a lesser included offense, and he was sentenced to probation for ten years. He obtained a GED, but while on probation he tested positive for cocaine, his probation was revoked and he was sent to prison for seven and one half years when he was eighteen years' old. While in prison, he was taught to live by a "code of honor" that prohibited him from "snitching" or "associat[ing] with corrections officers or any authority." He admitted to being an "associate" of the Mexican Mafia, some of whom were "stereotypically labeled as individuals who were contrary to the law." Since, he was released from jail, however, he said he had "tried to change [his] life" and was now "a Christian individual." He said he "didn't hurt" Chavez and asked the jury for leniency.

On cross-examination, when confronted with the jail call recording in which he referenced

---

[3] Officer Ontiveros testified that the Mexican Mafia is a known prison gang whose members participate "in anything from property crimes to assaults, aggravated assaults, murders, the distribution and manufacturing of narcotics."

his Mexican Mafia association in Spanish, he translated his own statement as "I was an associated member of the criminal organization identified as the Mexican Mafia." He admitted to telling his wife on the September 7, 2017 jail call that he called Chavez "a snitch." Martinez again denied stabbing Chavez, and claimed Young was responsible. To explain how Chavez's blood ended up on his shoes, Martinez said he lied to police when he told them he was not present when Chavez was stabbed and that he had actually seen Young and another individual fighting with Chavez. The prosecutor also asked Martinez about a jail call[4] he made to his mother during trial in which he told her that the police "planted" the blood on his shoes. Finally, Martinez admitted to violating the terms of his bond by testing positive for drugs, and that he had been disciplined several times for fighting with inmates while he was in custody awaiting trial.

The jury found two enhancement paragraphs true, and sentenced Martinez to life in prison.

**Discussion**

**Sub-Issue One:   Trial Error During Guilt Phase**

Martinez first contends admission of the two jail call recordings during the guilt phase of trial was error because the State failed to authenticate them, as required by Rule 901(a) of the Texas Rules of Evidence. Specifically, Martinez claims "there was no proper identification" of the voices on the recordings. The State responds by pointing out that Martinez's objection during the guilt phase of trial was *not* that the recordings were not authenticated, but rather, Martinez claimed they were inadmissible under Rule 403 because their prejudicial effect outweighed their probative value. The State contends this issue was waived because Martinez's complaint on appeal does not correspond with the complaint made at trial. We agree. *See* TEX.R.EVID. 103(a)(1); *see also Wilson*

---

[4]   This recording was not admitted into evidence.

*v. State*, 71 S.W.3d 346, 349 (Tex.Crim.App. 2002)("the point of error on appeal must comport with the objection made at trial."). We therefore overrule Martinez's first sub-issue as waived.

**Sub-Issue Two:   Trial Error During Punishment Phase**

Martinez's second contention is that the admission of the two jail call recordings during punishment was error because the State failed to authenticate the identity of the caller. The State concedes Martinez's second alleged error was preserved because Martinez's objection during the punishment phase is the same objection he raises on appeal. However, the State contends the trial court did not abuse its discretion in admitting the recordings during the punishment phase because the State produced "evidence sufficient to support a finding that the item is what the proponent claims it is," as required by Rule 901(a). Alternatively, the State argues that even if the admission of the recordings was error at the punishment stage, the error was harmless.[5]

**A.     Standard of Review**

We review a trial judge's decision to admit or exclude evidence under an abuse of discretion standard. *Henley v. State*, 493 S.W.3d 77, 82-83 (Tex.Crim.App. 2016). A trial judge abuses his discretion when his decision falls outside the zone of reasonable disagreement. *Id.* at 83. Before we may reverse the trial court's decision, we "must find the trial court's ruling was so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Id.* (*quoting Taylor v. State*, 268 S.W.3d 571, 579 (Tex.Crim.App. 2008)).

---

[5]   In his brief, Martinez makes the statement that "admission of these jail calls was far more prejudicial than probative." We do not interpret this statement to be a separate issue on appeal because it appears at the end of Martinez's arguments supporting his second issue and lacked citations to case law and omitted analysis that might support this contention. To the extent Martinez intended to make this a third issue on appeal, we find that it was waived as inadequately briefed. *See Saddler v. State*, No. 09-19-00212-CR, 2020 WL 6050790 (Tex.App.—Beaumont Oct. 14, 2020, no pet.)(mem. op., not designated for publication)(*citing Wolfe v. State*, 509 S.W.3d 325, 342-43 (Tex.Crim.App. 2017); *Tong v. State*, 25 S.W.3d 707, 710 (Tex.Crim.App. 2000)(en banc)("When an appellate issue is unsupported by argument or lacks citation to the record or legal authority, nothing is preserved for review.") and *Leza v. State*, 351 S.W.3d 344, 358 (Tex.Crim.App. 2011)).

**B.       Authentication of Jail Calls**

Rule 901(a) provides that "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." TEX.R.EVID. 901(a). Rule 901(b) provides a list of ten "non-exclusive examples of evidence of authentication or identification that complies with the rule's requirements." *Diamond v. State*, 496 S.W.3d 124, 141 (Tex.App.—Houston [14th Dist.] 2016, pet. ref'd).

During the punishment phase, the State introduced the relevant jail call recordings, State's Exhibits 118 and 119, through Michael Salinas the GTL Systems administrator in charge of the phone call recording system used at the jail in which Martinez was held. To support the admission of these recordings, the prosecutor elicited the following testimony:

> Q.   And I asked you to provide more calls for the Court. Did you have an opportunity to review those calls?
>
> A.   Yes, I did.
>
> Q.   Okay. Did you recognize those calls to be GTL calls?
>
> A.   They are GTL calls, yes.
>
> Q.   And are they kept in the regular course of business?
>
> A.   Yes.
>
> Q.   Okay. And you are the custodian of records for GTL?
>
> A.   I am.
>
> .                .                .
>
> Q.   Are these those calls that you were able to review?
>
> A.   Yes.

9

Q. And how do you know?

A. I initialed the disk myself.

Q. Perfect.

[THE PROSECUTOR]: Your Honor, at this time the State would move to admit State's Exhibits 118 and 119. (Exhibits offered, State's 118-119)

[DEFENSE COUNSEL]: We would object on the basis that this witness cannot identify the voices on that recording and, therefore, the proper predicate has not been laid.

[THE PROSECUTOR]: I can further lay the predicate, Judge.

THE COURT: All right. Sustained at this point.

Q. [THE PROSECUTOR] We are going to have to go through it again. I know in the earlier -- or in the earlier phase of trial you testified how calls are identified and how they are linked to a particular defendant.

A. Yes.

Q. Can you again tell the ladies and gentlemen of the jury how you are able to discern that these calls are coming from this particular defendant, Armando Martinez?

A. Each inmate is assigned an individual pin number. So whenever they pick up the phone, the system starts recording immediately. The process that they go through upon making a phone call is they are asked to enter that pin number along with a four-digit pin afterwards that the inmate selects. It is part of a security measure for them.

.               .               .

Q. [THE PROSECUTOR] How many pin numbers does Armando Martinez have?

A. One.

Q. Okay. And when reviewing these calls -- and we can listen to them again -- do you remember how the individual identifies himself?

A. Yes.

Q. How does he identify himself?

A. As Armando.

[THE PROSECUTOR]: Your Honor, at this time the State would move to admit State's 118 and 119. (Exhibits offered, State's 118-119)

Following this testimony, but before the trial court admitted the recordings into evidence, Martinez's attorney asked the court for permission to voir dire Salinas, which was granted. The following voir dire occurred:

VOIR DIRE EXAMINATION

BY [DEFENSE COUNSEL]:

Q. What is Armando Martinez's pin number?

A. I don't know it by memory.

Q. Prior to hearing these recordings, had you ever had a conversation with Mr. Martinez?

A. No, I have not.

Q. So you would not be able to identify his voice. Is that correct?

A. That is correct.

Q. Was there another individual on the other line?

A. Yes.

Q. On the receiving end?

A. Yes.

Q. Do you know who that individual was?

A. No, I don't.

Q. Have you ever heard that individual's voice?

A. No.

11

Q.    So you can't identify who that speaker was?

A.    No, I can't.

[DEFENSE COUNSEL]:   Thank you. I renew my objection, Your Honor.

THE COURT:   The objection is overruled. State's 118 and 119 are admitted. (Exhibits admitted, State's 118-119)

Thus, Martinez's argument at the punishment phase of trial, which he repeats on appeal, was that because Salinas could not testify he was familiar with Martinez's voice or that he recognized Martinez's voice on the recordings, the State's evidence did not support a finding that the recordings were what the State claimed they were, i.e. recordings of Martinez's conversations. Martinez presumably relies on Rule 901(b)(5), which provides that authenticity or identification is established under the following circumstances:

> **Opinion About a Voice**. An opinion identifying a person's voice--whether heard firsthand or through mechanical or electronic transmission or recording--based on hearing the voice at any time under circumstances that connect it with the alleged speaker.

TEX.R.EVID. 901(b)(5); *see e.g.*, *Diamond*, 496 S.W.3d at 141-42 (finding jail recordings admissible because police sergeant testified he interviewed defendant after arrest and recognized defendant's voice on the phone calls.). However, Subsection (b)(5) is not the only method by which a jail call recording can be authenticated or the caller identified. Indeed, "alternate grounds to authenticate the identity of a telephone caller include self-identification of the caller coupled with additional evidence such as the context and timing of the telephone call, the contents of the statement challenged, internal patterns, and other distinctive characteristics and disclosure of knowledge and facts known peculiarly to the caller." *Mosley v. State*, 355 S.W.3d 59, 69 (Tex.App.—Houston [1st Dist.] 2010, pet. ref'd). Here, the State's evidence established that the

recordings were made through the jail's phone call recording system, while Martinez was in jail, by an inmate utilizing Martinez's pin number and identifying himself as Armando, and engaging in conversation about topics unique to Martinez. This evidence is sufficient for purposes of Rule 901(a). Accordingly, the trial court did not abuse its discretion when it admitted the jail recordings during the punishment phase of trial. Martinez's second issue is overruled.

Finding no error, we affirm the trial court's judgment.

February 10, 2021

YVONNE T. RODRIGUEZ, Chief Justice

Before Rodriguez, C.J., Palafox, and Alley, JJ.

(Do Not Publish)