In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-23-00332-CR**
_____

**JESSE JAMES SEGUNDO, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 221st District Court**
**Montgomery County, Texas**
**Trial Cause No. 23-03-03459-CR**

**MEMORANDUM OPINION**

Appellant Jesse James Segundo ("Appellant," "Defendant" or "Segundo") appeals his conviction for violating a protective order two or more times within twelve months—a third degree felony offense. *See* Tex. Penal Code Ann. § 25.072. A grand jury indicted Segundo for intentionally and knowingly violating the terms of a protective order two or more times from on or about February 14, 2023, through February 25, 2023. The indictment also alleged that Segundo was previously convicted of a felony offense. Segundo pleaded "not guilty." A jury found him guilty

1

as charged in the indictment. Segundo pleaded "true" to the enhancement allegation, and the jury found the enhancement allegation "true" and assessed punishment at twenty years of confinement and a $10,000 fine. Segundo timely appealed raising four issues. We affirm the trial court's judgment of conviction.

Evidence on Guilt or Innocence

<u>Testimony of Jackie Muratorri</u>

Jackie Muratorri testified that she works as a detention officer at the Montgomery County Jail. She explained that she works on the probable cause docket, which sometimes includes preparing paperwork in connection with an emergency protective order and may include giving the paperwork to a judge in court and taking paperwork back to central jail records after the probable cause court proceedings have concluded. According to Muratorri, the accused person receives a copy of a protective order after the court has granted it. Muratorri identified State's Exhibit 2 as a recording of probable cause proceedings in this case, and the exhibit was published to the jury. Muratorri testified that the recording shows the judge hand Muratorri a packet of papers, including a probable cause sheet and protective order, and it also shows the Defendant signing the paperwork.

Muratorri identified State's Exhibit 1 as an emergency protective order against the accused, Jesse James Segundo, signed by a judge on February 6, 2023,

2

and it is also signed by Segundo. She agreed that the video in Exhibit 2 shows Segundo signing the order in front of a probation officer.

Testimony of Suzanne Hollifield

Suzanne Hollifield testified that she is an investigator with the Montgomery County District Attorney's Office in the domestic violence division. She explained that one of her duties is to access and listen to jail calls that inmates make, and those calls are monitored and recorded. Hollifield testified that each inmate has a unique account number, and the system used to record and save the calls includes the date the calls were made, the numbers called, and the duration of the calls. She explained that she listens to jail calls because sometimes they include admissions, confessions, coercion, or apologies. She also testified that sometimes inmates will use another inmate's account number or PIN, but if the inmate calls a "target number[]" that the inmate has previously called, the system will link that call to the inmate's account.

Hollifield testified that she was familiar with Segundo, and she identified him as the Defendant at trial. She agreed she had pulled his jail calls and had listened to the calls he made between February 12th and 25th of 2023. She also agreed that she recognized the voices in the calls. She recognized the victim's voice because the victim had a conversation with Hollifield when Hollifield served a subpoena on the victim. Hollifield testified that she pulled Segundo's calls that occurred between February 12th and 25th, ten of those calls were between Segundo and the victim

"Kimberly[,]"[1] and the victim did not answer one of those calls. Hollifield recalled that, when she served the victim with a subpoena, they talked about the subpoena, and Hollifield asked if Kimberly wanted a ride to the courthouse. Hollifield also testified that she recognized Segundo's voice because she watched the officer's body camera video from the date of Segundo's arrest and heard him speaking.

Hollifield explained that Segundo was arrested on February 5, 2023, and a copy of the indictment for that offense was admitted as State's Exhibit 6. The February 5th indictment reflects that Segundo was indicted for assault-family violence for intentionally and knowingly causing bodily injury to "Kimberly" by "grabbing, squeezing, and striking" her. Hollifield read from the protective order in this case, stating in relevant part, "This order is effective upon issuance and should remain in full force and effect for 91 days until midnight at the 8th day of May, 2023[]" and she agreed that the "start date" for the protective order was February 6, 2023.

Hollifield identified State's Exhibit 5 as a screenshot from the Securus System that provided Hollifield with access to listen to Segundo's jail calls. Hollifield agreed that State's Exhibit 3 is a fair and accurate representation of the recorded calls she reviewed from February of 2023. The prosecutor asked Hollifield how she was able

---

[1] We refer to the victim by a pseudonym. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

to authenticate the two people in these calls were Segundo and Kimberly, and the following exchange occurred:

> [Hollifield]: I can authenticate the defendant's voice from watching body cam video. I can authenticate the victim's voice from a conversation I had with her on Friday, October the 13th, in her home.
>
> [State]: About how long was that conversation?
>
> [Hollifield]: Five minutes.
>
> [State]: Does she have a distinct or unique voice?
>
> [Hollifield]: I think she does.
>
> [State]: How would you describe it?
>
> [Hollifield]: Sometimes, she speaks quickly, and other times, it's raspy. Sometimes, it's really low, but oftentimes, it's really fast.
>
> [State]: And is there anything within the contents of those calls that would also lead you to believe this conversation is between the defendant and the victim listed in the emergency protective order?
>
> [Hollifield]: Yes. In three of the four calls that have been tendered to the Court, the defendant calls her by name, "[Kimberly]."

Hollifield agreed that the first call Segundo made to Kimberly was on February 14, 2023. When asked what happened in that call, Hollifield replied,

> You are going to hear the defendant ask the victim to do an affidavit and get it notarized by the Court. You are also going to hear them talk about the name "[Reese] Segundo," and you are going to hear him talk about having letters sent to her from [Reese] Segundo.

5

Hollifield explained that "Reese" is Kimberly's middle name. Hollifield also agreed that Segundo called Kimberly on February 18, 2023, and she described that call as follows:

> The defendant is going to ask the victim if she checked the mail today because of the mail coming under the name [Reese] Segundo. He, then, is going to go back to talking to her about the affidavit, [and] getting it notarized at Woodforest Bank.

Hollifield testified about a third call Segundo made to Kimberly on February 21, 2023. According to Hollifield, that call related to a commissary account where persons outside of the jail can put money on an inmate's commissary account to purchase food or other items. The last call the Prosecutor asked about was made on February 25, 2023, and Hollifield testified:

> You are going to hear him ask her when she gets money, and she's going to tell him when she gets money. It's going to talk about if he gets [out] on bond without a monitor, that he can go home.

Hollifield agreed that going home was a violation of the protective order. Hollifield testified that Segundo continued to try to call Kimberly from jail after he was charged with violating the protective order, including making a phone call to a person Hollifield believed was Segundo's son in which Segundo asked for Kimberly's new phone number, and then another call when Segundo called Kimberly's new phone number on April 7, 2023. Hollifield testified that, when she ran a report for the new number, the report showed that Segundo dialed that number "[h]undreds[]" of times, and she recalled listening to calls where she heard Segundo

and Kimberly speaking. The recorded jail calls in State's Exhibit 3 were published to the jury.

Hollifield identified State's Exhibit 7 as a report from the Securus System for Kimberly's new phone number, and the report showed forty-seven calls by Segundo from jail to that number between February 5, 2023 and May 8, 2023. According to Hollifield, in one call she listened to, Segundo asked Kimberly to fill out a non-prosecution affidavit and have it notarized at a bank.

Testimony of Amy Doss

Amy Doss testified that she is a Victim Assistance Coordinator for the Montgomery County District Attorney's Office, she is bilingual, and Spanish is her first language. She agreed that she listens to jail calls as part of her job duties. Doss testified that she was assigned to this case, she had watched video showing Segundo and listened to Segundo's voice, and she identified the Defendant as Segundo.

Doss testified that she listened to a jail call from February 12, 2023, that Suzanne Hollifield had pulled, in which Segundo identified himself. Doss explained that she had previously watched a body camera video (with audio) of Segundo that enabled her to identify Segundo's voice. According to Doss, in the February 12th jail call, Segundo spoke with his mother, and she agreed that State's Exhibit 4 was a fair and accurate recording of that call. Doss described the call as follows:

> . . . Mr. Segundo tells his mother that he has papers that the victim needs to sign, that he cannot talk to the victim or they will file more charges

7

on him, "they," referring to the district attorney's office. He tells his mom to tell the victim to write to him under a different name, not to put her name. He specifically designates a name of [Reese] Segundo when she writes to him.

State's Exhibit 4 was published to the jury.

After the State rested, the defense rested. The Defendant called no witnesses and did not offer any evidence. The jury found Segundo guilty as charged in the indictment.

## Punishment Phase Evidence

In an enhancement paragraph in the indictment, the State alleged that Segundo was convicted of burglary of a habitation with intent to commit theft in 1999 and that conviction became final before he committed the offense for which he was charged in this case. Segundo pleaded "true" to the enhancement allegation.

Testimony of Sergeant David Stovall

Sergeant David Stovall testified that he is an investigator with the Montgomery County District Attorney's Office and a fingerprint comparison expert. He testified that he has been in law enforcement for over thirty years and has fingerprinted "thousands of people." Stovall explained that the Texas Department of Criminal Justice creates a penitentiary packet or "pen packet" for each person who is convicted of an offense, and the pen packet includes multiple identifiers, including the person's name, date of birth, driver's license number, social security number, previous convictions and their trial cause numbers, and a state or county ID number.

Stovall testified that when he is trying to prove up a judgment for a prior conviction, he starts with fingerprints obtained when the person was arrested for the current offense, and he compares the other information in the pen packet to the defendant's information. Stovall agreed that he used this methodology when reviewing the documents in State's Exhibits P1 through P23.

Stovall testified that he began his review by taking fingerprints from Segundo the day before Stovall testified so that his starting point would be the fingerprints he knew were from Segundo. State's Exhibit P1 is a 1994 judgment for misdemeanor theft that Stovall testified "only has identifiers[]" and not fingerprints. However, Stovall testified that he was able to tie Exhibit P1 to Segundo through use of a DPS fingerprint card that included Segundo's name, his criminal history, the cause number, arrest date, the date of the offense, and the judgment date. Based on the totality of the evidence, Stovall was able to conclude that P1 "belongs to Mr. Segundo."

Stovall identified State's Exhibit P1-A as a "certified DPS ten card[,]" and Stovall testified that the card includes a tracking number found on Segundo's criminal history and date of offense that closely matches the 1994 judgment. Stovall testified that he also used the right thumbprint from the card to link the judgment in Exhibit P1 to Segundo.

9

Stovall identified State's Exhibits P3 through P5 representing a judgment for Segundo, a revocation, and a pen packet for a 1999 conviction for felony burglary of a habitation with intent to commit theft. The prosecutor asked the trial court to take judicial notice that Segundo pleaded "true" to this judgment, as alleged in the indictment. Stovall also connected the following exhibits to prior convictions for Segundo:

- a 1997 judgment for misdemeanor possession of marijuana (State's Exhibit P2);
- a 1997 judgment for misdemeanor evading arrest (State's Exhibit P6);
- a 2004 judgment for misdemeanor criminal trespass (State's Exhibit P8);
- a 2005 judgment for misdemeanor theft (State's Exhibits P9 and 9-A);
- a 2005 judgment for misdemeanor possession of marijuana (State's Exhibits P10 and P10-A);
- a 2006 judgment adjudicating guilt for possession of cocaine (state jail felony) (State's Exhibit P11);
- a 2007 judgment for felony theft (state jail felony) (State's Exhibits P12 and P12-A);
- a 2008 judgment for misdemeanor possession or use of abusable volatile (State's Exhibits P13 and P13-A);
- a 2008 judgment for misdemeanor assault on a family member (State's Exhibits P14 and P14-A);
- a 2008 judgment for misdemeanor failure to identify oneself to a peace officer (State's Exhibits P15 and P15-A);
- a 2010 judgment for attempted assault on a family member, second offender (State's Exhibit P16);
- a 2012 judgment for trespass to property/building, no depart (State's Exhibit P17);
- a 2012 judgment for interference with duties of a public servant (State's Exhibit P18);

10

- a 2014 judgment for attempted felon in possession of a weapon (State's Exhibits P19 and P20);
- a 2016 judgment for felony theft-third offender (state jail felony) (State's Exhibits P21 and P21-A);
- a 2018 judgment for misdemeanor assault of a family member by impeding breath or circulation of the complainant's neck or throat (State's Exhibits P22 and P22-A); and
- a 2018 judgment for attempted assault on a public servant (state jail felony) (State's Exhibit P23).

Stovall testified that three judgments for Segundo included copies of charging instruments indicating that Kimberly was the victim or complainant in: the 2008 judgment for assault on a family member, the 2010 judgment for attempted assault on a family member, and the 2018 judgment for assault of a family member. Stovall testified that some of the felony charges were reduced to state jail offenses, and some of the felonies were reduced to misdemeanors. Stovall also agreed that after all these prior judgments, Segundo had served only two years in the Texas Department of Criminal Justice.

Testimony of Ross Hutto

Ross Hutto testified that he was a Senior Police Officer with the Houston Police Department in the Northeast Patrol Division, and he was assigned to a case in 2016 where Segundo was the defendant and Kimberly was the victim. He identified State's Exhibits P24 through P29 and P31 through P33 as copies of photos he took during that investigation, and the exhibits were published to the jury. Hutto explained that Exhibit P24 includes the case number and the date December 14,

11

2016. Hutto agreed that the offense report number matched the case number in Exhibit P22, which is a judgment for assault of a family member and shows "Date of Offense: 12/14/16" and he took the photos referenced above on that offense. Hutto identified Kimberly in the photos. Hutto testified that Exhibit P25 shows Kimberly with "[d]ry blood around the lips and swelling of the nose[,]" P26 shows abrasions on the front of her neck, P27 shows bruising and abrasions, P28 shows bruising and abrasions on the back of her neck, P31 shows bruising and abrasions on the left side of her neck, and P32 shows her left earlobe that was severed and that "[i]t appears possible an earring was ripped out[.]"

Additional Testimony of Suzanne Hollifield

Suzanne Hollifield gave additional testimony about the recorded jail calls about which she had previously testified. She testified that at one point, Segundo admitted he was guilty of assaulting the victim in this case, he said, "All I did was scratch your little, f**king neck[,]" and in one of the calls he also tried to entice Kimberly to commit a crime—namely, selling Xanax—so she could put more money into his jail account. Hollifield also agreed that in one of the jail calls to Kimberly, Segundo told Kimberly that she needed to be on the same page with him and that she needed to be a "boss" and not a "flunky."

12

After the State rested, the defense rested without calling any witnesses. The jury found the enhancement allegation "true" and assessed punishment at twenty years of confinement and a fine of $10,000. Segundo timely filed a Notice of Appeal.

## Issues

In his first issue, Appellant argues that the trial court abused its discretion in finding that the State had adequately authenticated the jail calls in State's Exhibit 3. In his second issue, Appellant argues that the trial court abused its discretion in finding that the State had established that State's Exhibits P1 and P1-A adequately linked Appellant to the prior felony conviction alleged as an enhancement in the indictment. In his third issue, Appellant argues that the evidence is insufficient to support his conviction. And in his fourth issue, Appellant argues that the judgment should be reformed to eliminate court costs because he was found indigent and there was no material change in his circumstances.

## Authentication of Jail Calls
### (Issue One)

In his first issue, Appellant argues that the trial court abused its discretion in overruling his objection to State's Exhibit 3 (recorded jail calls) because the voices on the recordings were not adequately authenticated. According to Appellant, there was "no testimony to indicate that [Investigator Hollifield] had listened to the jail calls only after meeting with [Kimberly] and reviewing the [body camera] footage so as to substantiate her identification of the voices." Appellant contends that

because Hollifield had not talked with Kimberly and Segundo on multiple occasions, her testimony was insufficient to identify their voices and authenticate the exhibit. In addition, Appellant argues that Kimberly disregarded her subpoena and did not appear at trial, so the jury was not able to make its own determination whether the woman's voice in the jail calls was Kimberly's.

We review a trial court's ruling on authentication for an abuse of discretion. *Fowler v. State*, 544 S.W.3d 844, 848 (Tex. Crim. App. 2018). Under this deferential standard, if the trial court's ruling is within the zone of reasonable disagreement, an appellate court must uphold the court's admissibility decision. *Id.*; *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012). Rule 901 outlines the authentication requirement for the admissibility of evidence, and it requires the proponent of an item of evidence to "produce evidence sufficient to support a finding that the item is what the proponent claims it is." Tex. R. Evid. 901(a). "As with evidence in general, authenticating evidence may be direct or circumstantial." *Butler v. State*, 459 S.W.3d 595, 602 (Tex. Crim. App. 2015).

Rule 901(b) provides a nonexclusive list of methods for authenticating evidence. *See* Tex. R. Evid. 901(b). Evidence may be authenticated in several ways, including by direct testimony from a witness with personal knowledge, by comparison with other authenticated evidence, or by circumstantial evidence. *Tienda*, 358 S.W.3d at 638; *see Butler*, 459 S.W.3d at 602 (noting that authenticating

14

evidence may be direct or circumstantial). Further, authenticity may be established with evidence of "'distinctive characteristics and the like,' including '[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances.' Tex. R. Evid. 901(b)(4)." *Acosta v. State*, No. AP-77,092, 2024 Tex. Crim. App. Unpub. LEXIS 225, at \*100 (Tex. Crim. App. June 5, 2024) (per curiam).

One way in which a voice can be identified is with "[a] [person's] opinion identifying a voice—whether heard firsthand or through mechanical or electronic transmission or recording—based on hearing the voice at any time under circumstances that connect it with the alleged speaker." *See* Tex. R. Evid. 901(b)(5); *see also Hasley v. State*, 786 S.W.2d 733, 734 (Tex. App.—Beaumont 1989, pet. ref'd). So, a witness is qualified to identify voices in a recording for the purposes of authentication under Rule 901 if the witness has had conversations with the speaker or if the witness has heard the voice under circumstances that connect it with the alleged speaker. Tex. R. Evid. 901(b)(5); *Angleton v. State*, 971 S.W.2d 65, 67-68 (Tex. Crim. App. 1998) (en banc) (the officer was qualified to make an identification of the speakers because he had carried on a conversation with them). Similarly, recorded jail cell calls can be sufficiently authenticated by a witness who is "familiar with the voices" on the calls, or who testifies about other factors that exist to identify the speakers. *Long v. State*, No. 09-15-00295-CR, 2017 Tex. App. LEXIS 4221, at

15

**4-5 (Tex. App.—Beaumont May 10, 2017, no pet.) (mem. op., not designated for publication) (finding the recorded jail calls were sufficiently authenticated based on testimony by witnesses who were "familiar" with defendant's voice and the calls were made by an inmate at the jail, on the jail recording system, using the inmate's identification number); *see also Martinez v. State*, No. 08-19-00046-CR, 2021 Tex. App. LEXIS 1023, at **16-17 (Tex. App.—El Paso Feb. 10, 2021, no pet.) (mem. op., not designated for publication) (concluding recorded jail calls were sufficiently authenticated where administrator for the jail phone system testified the recordings were made through the jail's phone call recording system while defendant was in jail by someone using the defendant's unique identification number); *Raper v. State*, No. 05-12-01047-CR, 2013 Tex. App. LEXIS 12332, at **3-5 (Tex. App.—Dallas Sept. 30, 2013, pet. ref'd) (mem. op., not designated for publication) (concluding that recorded jail calls were sufficiently authenticated based on circumstances connecting the recordings with defendant where police investigator testified that the calls were linked to defendant's unique identification number when he was booked into jail and the caller referred to the complaining witness in the calls).

The authentication requirement is a liberal standard of admissibility. *Fowler*, 544 S.W.3d at 848-49 (quoting *Butler*, 459 S.W.3d at 600). The proponent must produce sufficient evidence from which a reasonable factfinder could find genuineness. *Tienda*, 358 S.W.3d at 638. Conclusive proof of authenticity is not

16

required. *Fowler*, 544 S.W.3d at 848. The trial court need only make a preliminary determination that the proponent of the evidence has supplied facts sufficient to support a reasonable jury determination that the proffered evidence is authentic. *Id.* at 849. It is up to the jury to make the final determination of whether the evidence is what the proponent claims it to be. *Butler*, 459 S.W.3d at 600. Error in the admission of evidence is nonconstitutional error that we disregard unless the error affected the appellant's substantial rights. *See* Tex. R. App. P. 44.2(b); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

Here, Suzanne Hollifield testified that the recordings were made at the Montgomery County Jail through the jail's phone call recording system, while Segundo was in jail, by an inmate utilizing Segundo's unique personal identification number and to phone numbers that Segundo had previously called using his unique personal identification number. Hollifield testified that she recognized Kimberly's voice in the recorded jail calls based on her own conversation with Kimberly when serving Kimberly with a subpoena, and she testified that Kimberly's voice was distinctive in that "[s]ometimes, she speaks quickly, and other times, it's raspy. Sometimes, it's really low, but oftentimes, it's really fast." Hollifield further testified that she recognized Segundo's voice because she had viewed the officer's body camera video from when Segundo was arrested. In addition, Hollifield testified that in three of the calls, Segundo called Kimberly by her name.

The illustrations for authentication in Rule 901(b) are not exhaustive, and they do not limit the general provisions in Rule 901(a). *See Morris v. State*, 460 S.W.3d 190, 196 (Tex. App.—Houston [14th Dist.] 2015, no pet.). Other means of authenticating the identity of the speakers' voices in a telephone call include evidence such as the context of the telephone call, the contents of the statements made during the telephone call, and disclosure of knowledge and facts known particularly to the speakers. *Id*. (citing *Mosley v. State*, 355 S.W.3d 59, 69 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd)). Hollifield testified that, in the jail calls, Segundo is heard telling Kimberly to watch her mail for letters from "[Reese] Segundo[,]" and Reese is Kimberly's middle name. In addition, Hollifield testified that she retrieved the recorded calls from the jail system, that each inmate has a unique account number to use in making phone calls, and that she had pulled the calls associated with Segundo's unique account number.

Therefore, we conclude the trial court could have reasonably found that Hollifield's identification of Kimberly's voice was based on her personal knowledge, and Hollifield's identification of Segundo's voice was based on her hearing Segundo speak in the body camera video when he was arrested, as well as other identifiers from the context and content of the telephone calls. *See* Tex. R. Evid. 901(b)(5); *Angleton*, 971 S.W.2d at 67-68; *Hasley*, 786 S.W.2d at 734. On this record, we find no abuse of discretion by the trial court in making a preliminary

determination that the State presented sufficient evidence to support a reasonable jury determination that the proffered evidence is authentic. *See Fowler*, 544 S.W.3d at 849; *Tienda*, 358 S.W.3d at 639-40. Finding no error in the court's ruling that the jail calls were sufficiently authenticated, we need not examine whether Appellant was harmed. *See Burleson v. State*, 819 S.W.2d 537, 539 (Tex. Crim. App. 1991) (Baird, J., concurring) ("[W]ithout error there can be no harm[.]"). We overrule Appellant's first issue.

Admission of Punishment Exhibits
(Issue Two)

In his second issue, Appellant argues that the trial court erred by admitting State's Exhibits P1 and P1-A relating to a 1994 felony conviction. According to Appellant, Exhibit P1 is "barely legible" and contains no descriptors except for the first and last name of the person convicted and a conviction date of December 1, 1994. Appellant further contends that Exhibits P1 and P1-A reflect different dates of the offense. Exhibits P1 and P1-A are for a 1994 offense, which is not the 1999 conviction the State alleged in the enhancement paragraph. The State offered Exhibits P3 through P5 in support of the 1999 conviction for burglary of a habitation with intent to commit theft. Appellant does not challenge those exhibits, and he pleaded true to the enhancement paragraph.

"[T]o establish that a defendant has been convicted of a prior offense, the State must prove beyond a reasonable doubt that (1) a prior conviction exists, and (2) the

defendant is linked to that conviction." *Henry v. State*, 509 S.W.3d 915, 918 (Tex. Crim. App. 2016) (citing *Flowers v. State*, 220 S.W.3d 919, 921 (Tex. Crim. App. 2007)). No specific document or mode of proof is required to prove these two elements. *Id.* Evidence of a certified copy of a final judgment and sentence may be a preferred and convenient means, but the State may use other types of evidence to prove an enhancement. *Id.* Examples of acceptable evidence include the admission or stipulation of the defendant, testimony by people present at the time of the defendant's conviction and who can identify the defendant as the person convicted, and documentary proof which contains sufficient information to establish that a prior conviction exists and the defendant's identity as the person convicted. *Id.* (citing *Flowers*, 220 S.W.3d at 921-22).

The Court of Criminal Appeals has indicated the process used by the State of proving up prior convictions closely resembles putting together a "'jigsaw puzzle.'" *Flowers*, 220 S.W.3d at 923 (quoting *Human v. State*, 749 S.W.2d 832, 835-36 (Tex. Crim. App. 1988) (op. on reh'g)). Ultimately, it is for the factfinder to consider the totality of the evidence admitted and determine (1) whether there was a previous conviction, and (2) whether the defendant was the person convicted. *Id.* If these two elements can be found beyond a reasonable doubt, then the pieces used to complete the "jigsaw puzzle" are necessarily legally sufficient to prove a prior conviction. *Id.* In addition, any alleged missing data in the evidence or inconsistencies with other

evidence would go to the weight, and not the authenticity, of the challenged exhibits. *See Robinson v. State*, 739 S.W.2d 795, 802 (Tex. Crim. App. 1987) (en banc); *Hasley*, 786 S.W.2d at 735.

Additionally, if a defendant pleads "true" to an enhancement paragraph, that relieves the State of its evidentiary burden to prove the enhancement allegations and the defendant cannot complain on appeal that the evidence is insufficient, unless the record affirmatively reflects that the enhancements were improper. *See Hopkins v. State*, 487 S.W.3d 583, 586 (Tex. Crim. App. 2016) (citing *Roberson v. State*, 420 S.W.3d 832, 838 (Tex. Crim. App. 2013)); *Magic v. State*, 217 S.W.3d 66, 70 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

The record here reflects that Segundo pleaded true to the enhancement paragraph. The jury charge included the following instruction: "To the allegation in Enhancement Paragraph 1 of the indictment, the defendant has pleaded 'True.' Therefore, you are instructed to find Enhancement Paragraph [1] to be 'True.'" Appellant does not argue that State's Exhibits P1 and P1-A affirmatively reflect that the enhancement was improper or that the prior conviction as charged in the indictment was not final. *See Hopkins*, 487 S.W.3d at 586; *Roberson*, 420 S.W.3d at 838. Any inconsistencies between the exhibits would go to their weight, and not their authenticity. *Robinson*, 739 S.W.2d at 802; *Hasley*, 786 S.W.2d at 735. We overrule Appellant's second issue.

21

Sufficiency of the Evidence
(Issue Three)

In his third issue, Appellant argues that the evidence is not sufficient to support the jury's finding of guilt because the evidence was not credible. Appellant argues:

> There was no proof offered in the case that [Kimberly] was ever harmed by Appellant in 2023: no bruises, 911 call, hospital records, etc. Furthermore, there was no evidence that [Kimberly] was intimidated by or frightened of Appellant. In fact, all the evidence proved that [Kimberly] wanted Appellant to contact her.

In reviewing the sufficiency of the evidence, we review all the evidence in the light most favorable to the verdict to determine whether a rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We give deference to the factfinder's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper*, 214 S.W.3d at 13. If the record contains conflicting inferences, we must presume that the factfinder resolved such facts in favor of the verdict, and we defer to that resolution. *Brooks v. State*, 323 S.W.3d 893, 899 n.13 (Tex. Crim. App. 2010) (citing *Jackson*, 443 U.S. at 326); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). The jury as factfinder is the sole judge of the weight of the evidence and credibility of the witnesses, and a jury may believe all, some, or none of the testimony presented by the parties. *See Febus*

22

*v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018) (citing *Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000), *overruled on other grounds by Laster v. State*, 275 S.W.3d 512 (Tex. Crim. App. 2009)); *Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex. Crim. App. 1995). The appellate court does not reweigh the evidence nor determine the credibility of the evidence, nor does it substitute its own judgment for that of the factfinder. *Febus*, 542 S.W.3d at 572; *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

"Direct and circumstantial evidence are treated equally: 'Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt.'" *Clayton*, 235 S.W.3d at 778 (quoting *Hooper*, 214 S.W.3d at 13). Each fact need not point directly and independently to the guilt of the defendant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Temple v. State*, 390 S.W.3d 341, 359 (Tex. Crim. App. 2013); *Hooper*, 214 S.W.3d at 13; *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993).

Section 25.072(a) of the Penal Code provides that "[a] person commits an offense if, during a period that is 12 months or less in duration, the person two or more times engages in conduct that constitutes an offense under Section 25.07[,]" and the offense is a third degree felony. *See* Tex. Penal Code Ann. § 25.072(a), (e). Section 25.07 states, in relevant part, that a person commits an offense if, in violation

of Article 17.292 of the Code of Criminal Procedure, the person knowingly or intentionally communicates

> in any manner with the protected individual or a member of the family or household except through the person's attorney or a person appointed by the court, if the violation is of an order described by this subsection and the order prohibits any communication with a protected individual or a member of the family or household[.]

*See* Tex. Penal Code Ann. § 25.07(a)(2)(C).

Here, the State alleged that Segundo communicated with Kimberly in violation of a protective order. Appellant has not challenged that he was subject to a protective order. The State was not required to prove that Appellant's conduct caused any particular result, including fear or family violence. *See Wesley v. State*, 605 S.W.3d 909, 918 (Tex. App.—Houston [14th Dist.] 2020, no pet.). To the extent Appellant argues that the evidence is insufficient because there is no evidence that Kimberly was harmed, intimidated, or frightened by Appellant's calls and communications, Appellant cites no legal authority for his argument that the State must show the communications caused Kimberly harm, intimidation, or fear, and those items are not elements of the offense for which he was charged. *See* Tex. Penal Code Ann. §§ 25.07(a)(2)(C), 25.072(a); Tex. R. App. P. 38.1(i).

The record includes a copy of the protective order signed by the trial court and by Segundo on February 6, 2023. Above Segundo's signature, the order states, "I am the above-named Defendant in this case, and I have received a copy of the

Magistrate's Order for Emergency Protection in open court, on this the 6[th] day of February, 2023." The protective order was issued against Jesse James Segundo, and it was issued at the request of the victim, Kimberly. The order further provides that it restricts Segundo from going within 200 yards of a specific address and prohibits the following acts, in relevant part, "communicating in any manner with a member of the family or household of a person protected under the order or with the person(s) protected under the order, except through the party's attorney or a person appointed by the court (good cause)."

The evidence also reflects that Segundo knew about the protective order. His signature is on the order. Jackie Muratorri, a detention officer for Montgomery County, identified State's Exhibit 2 as a recording of probable cause proceedings in this case, the exhibit was published to the jury, and Muratorri testified that the recording shows the Defendant signing the paperwork. Amy Doss, a Victim Assistance Coordinator for the Montgomery County District Attorney's Office, testified that in one of the phone calls Segundo made from jail, he told his mother that he had papers that Kimberly needed to sign, and he said if he talked to the victim, the District Attorney's Office would file more charges against him. He also told his mother to tell Kimberly to use her middle name.

Finally, Suzanne Hollifield, an investigator with the Montgomery County District Attorney's Office, testified that Segundo made twenty-one calls from jail,

and records retrieved from the Securus System—which records inmate calls from jail—reflect that ten of the calls were between Segundo and Kimberly. She also testified that the ten calls from Segundo to Kimberly occurred between February 12 and 25, 2023, which is after the date the emergency protective order became effective (February 6, 2023) and before it expired (May 8, 2023). Hollifield further testified that in three of the phone calls from jail, Segundo called Kimberly by her name.

Therefore, we conclude that the evidence sufficiently established there was an emergency protective order against Segundo for the protection of Kimberly, Segundo knew about the order, and he violated it two or more times during a period that was twelve months or less. *See* Tex. Penal Code Ann. § 25.072(a). Based on the record before us, the jury could have reasonably concluded beyond a reasonable doubt from the evidence presented that Segundo committed the offense of violation of a protective order two or more times in a period that was twelve months or less as alleged in the indictment. *See id.*; *see also Jackson*, 443 U.S. at 319; *Hooper*, 214 S.W.3d at 13. We further conclude that "[t]his was not a determination so outrageous that no rational trier of fact could agree." *Wirth v. State*, 361 S.W.3d 694, 698 (Tex. Crim. App. 2012). We overrule Appellant's third issue.

Assessment of Court Costs
(Issue Four)

In his fourth issue, Appellant argues that the judgment should be reformed to eliminate the court costs assessed against him because there were "continuous findings of Appellant's indigency." Appellant argues that he was found to be indigent, counsel was appointed to represent him at the outset of the case, and the record includes no evidence that Appellant had a material change in financial circumstances that would show he was no longer indigent.

We note that the Appellant fails to cite to any part of the record where Appellant made any objection in the trial court about the assessment of court costs against him, nor does he argue on appeal that he was not required to preserve error on this issue. *See* Tex. R. App. P. 33.1. That said, assuming without deciding that error was preserved, we find no error. Article 42.16 of the Code of Criminal Procedure provides that a trial court "shall [] adjudge the costs against the defendant[] and order the collection thereof as in other cases." Tex. Code Crim. Proc. Ann. art. 42.16. Fees and costs serve a remedial function by compensating the State for various costs associated with the criminal justice system. *Gipson v. State*, 428 S.W.3d 107, 109 (Tex. Crim. App. 2014). "[C]ourt costs are not part of the guilt or sentence of a criminal defendant, nor must they be proven at trial; rather, they are 'a nonpunitive recoupment of the costs of judicial resources expended in connection

with the trial of the case.'" *Johnson v. State*, 423 S.W.3d 385, 390 (Tex. Crim. App. 2014) (quoting *Armstrong v. State*, 340 S.W.3d 759, 767 (Tex. Crim. App. 2011)).

This Court has previously held that a trial court can assess court costs against an indigent defendant. *See Valdez v. State*, No. 09-22-00148-CR, 2022 Tex. App. LEXIS 8915, at *8 (Tex. App.—Beaumont Dec. 7, 2022, no pet.) (mem. op., not designated for publication) (citing *Armstrong*, 340 S.W.3d at 766-67; *Allen v. State*, 426 S.W.3d 253, 258-59 (Tex. App.—Texarkana 2013, no pet.); *Owen v. State*, 352 S.W.3d 542, 546-47 (Tex. App.—Amarillo 2011, no pet.); *Williams v. State*, 332 S.W.3d 694, 700 (Tex. App.—Amarillo 2011, pet. denied)). Accordingly, we overrule Appellant's fourth issue.

Having overruled all of Appellant's issues, we affirm the trial court's judgment of conviction.

AFFIRMED.

LEANNE JOHNSON
Justice

Submitted on August 9, 2024
Opinion Delivered September 25 2024
Do Not Publish

Before Johnson, Wright and Chambers, JJ.

28