In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-23-00387-CR

JAMES LOUIS BARNES JR., Appellant

V.

THE STATE OF TEXAS, Appellee

**On Appeal from the 359th District Court
Montgomery County, Texas
Trial Cause No. 21-03-03120-CR**

## MEMORANDUM OPINION

Appellant James Louis Barnes Jr. appeals his conviction for capital murder. *See* Tex. Penal Code Ann. § 19.03(a)(2). In four issues, Barnes complains about the sufficiency of the evidence and the admission of a jail call, extraneous offense evidence, and identification evidence. We conclude the evidence was legally sufficient to support the jury's guilty verdict; the State presented sufficient evidence to support a reasonable jury determination that the jail call was authentic; the extraneous offense was admissible as same transaction contextual evidence; and that

Barnes failed to preserve his complaints about the pretrial identification procedure's being impermissibly suggestive. We affirm the trial court's judgment.

## BACKGROUND

The indictment alleged that Barnes "did then and there intentionally cause the death of an individual, namely, [Michael], by shooting [Michael] with a deadly weapon, namely a firearm, and the defendant was then and there in the course of committing or attempting to commit the offense of robbery of [Michael][.]"[1] During a pretrial hearing, the trial court considered the State's bench brief regarding the admission of an extraneous offense involving an attempted aggravated robbery of a meat market in Waller County that occurred within hours of the current offense. The State explained that the extraneous offense involved two black males, a skinny and heavy-set one, who drove up to the meat market in a black sedan. Surveillance video from the meat market showed the two-armed males tried to enter the meat market and commit aggravated robbery. The heavy-set male had a wide-stock tan pistol and wore black pants or shorts under his tan pants, which had a distinctive emblem, and a black full-face mask, boots, and gloves.

The State explained the current offense occurred at a taco stand about four hours after the extraneous offense and involved a skinny and heavy-set male who

---

[1]To protect the privacy of the victim, his wife, and the civilian witnesses, we identify them by using pseudonyms. *See* Tex. Const. art. I, § 30.

were armed and demanded money and jewelry from Michael and his wife, Gina. The heavy-set male wore dark clothes and a mask and used a black pistol to shoot Michael in the head. The two males fled and left a .40 caliber cartridge casing at the scene. About an hour later, the police stopped Barnes, who was wearing a black hooded sweatshirt and shorts and driving a sedan like the one used in the extraneous offense. The police found tan pants with a distinctive emblem like the ones worn during the extraneous offense in the sedan, and Michael could not be excluded as a contributor to the bloodstain found on the tan pants. The police also found a live .40 caliber round that matched the cartridge casing found at the scene of the current offense and the tan wide-stock pistol like the one used in the extraneous offense.

The State argued the extraneous offense was admissible as same-transaction contextual evidence and because it was relevant to prove Barnes's identity and intent. The State explained that they did not have a witness who was able to testify that Barnes was wearing the tan pants during the current offense, and the admission of the extraneous offense was necessary for the jury to understand the current offense was part of a crime spree that involved two offenses that occurred in close locations within a short period of time. The State argued the extraneous offense would help the jury understand why Michael's DNA was on the tan pants and that the tan wide-stock pistol was used in the extraneous offense. The State also argued that Barnes's DNA was on the inside waistband of the pants which showed Barnes wore those

3

pants during the extraneous offense. The State noted that a magistrate found probable cause to issue a warrant for Barnes's arrest for the extraneous offense.

Defense counsel objected that the extraneous offense was inadmissible based on Rules 403 and 404(b) of the Texas Rules of Evidence. *See* Tex. R. Evid. 403, 404(b). Barnes argued the extraneous offense was confusing and misleading to the jury and was more prejudicial than probative. Barnes complained that the pants with Michael's DNA and the .40 caliber cartridge casing found on the passenger side of the sedan Barnes was driving served no purpose for identification.

The trial court allowed the State to present evidence of the attempted aggravated robbery and to refer to it during opening statements. The trial court explained that it did not consider the attempted aggravated robbery to be an extraneous offense because it was closely related in time and the State planned to use its surrounding circumstances to prove a main fact in the current case. The trial court found that based on the State's reasons, the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice.

The trial court conducted a jury trial. Detective Byron Fausset of the Waller County Sheriff's Office testified that it was around 9:00 p.m. on December 5, 2020, when he responded to an attempted aggravated robbery at a meat market located near the Montgomery County line. Fausset stated the meat market had a surveillance video of the attempted robbery, and the trial court admitted the video and still shots

into evidence. Fausset explained that the video shows a dark four-door sedan backing into the parking lot and two males–a thinner one wearing athletic pants and one wearing khaki pants–running towards the door. The male with khaki pants, who was either a light-skinned black male or Hispanic, drove the sedan and wore a dark top, black combat boots, black shorts or underwear, and a ski mask that only showed his eyes and mouth. Fausset explained the khaki pants were falling and had a brand label on the right hip area he could not identify. Fausset stated that both males had handguns and after the male with athletic pants pulled on the front door, both fled to the sedan and left.

Wayne was working at the meat market when the attempted aggravated robbery occurred. Wayne explained the door was locked because the store had been robbed before. Wayne saw two men, who had their faces covered, approach the door and leave after one of the men, who had a gun, tried to open the door. Wayne testified that the cashier called 911 and then reported the incident to security.

Deputy Austin Porter of the Montgomery County Sheriff's Office testified that around 1:00 a.m. he responded to a call about an assault with a firearm at the taco stand. Porter testified that Michael had a gunshot wound and died shortly after he arrived, and he spoke with Gina and her son, Richard, about the incident and photographed the scene.

Richard testified that he was at home when he heard a loud boom and Gina yell, so he grabbed his gun and ran to Gina, who told him to talk to 911. Richard explained that Gina did not speak English, so he spoke with the dispatcher and reported that Michael was shot in the head. The trial court admitted the 911 call into evidence. Richard testified that Gina provided a description of the shooter to the police, and he found an Instagram photo of a man matching that description and showed it to Gina, who identified the man as the shooter.

Defense counsel objected to the admission of the photo, which was marked as State's Exhibit 32 and which purportedly showed Barnes and two other males pointing guns at the camera. Defense counsel argued the photo was inadmissible under Rule 403 and 404 because it was more prejudicial than probative and would inflame or mislead the jury. The State argued that identity was a central issue, and Richard had knowledge of Barnes's gang and heard that Barnes might be responsible for a series of aggravated robberies. The State argued that it was laying the foundation for Gina's out-of-court identification of Barnes to Richard, and that Richard's testimony about Gina's identification was not hearsay under Rule 801. Defense counsel objected that it was hearsay under these circumstances.

After reviewing Rule 801(e)(1)(c), which provides that a prior statement identifying a person as someone the declarant-witness perceived earlier is not hearsay when the declarant testifies and is subject to cross-examination, the trial

6

court overruled defense counsel's objection and admitted State's exhibit 32. *See* Tex. R. Evid. 801(e)(1)(c).  Richard testified that State's exhibit 32 is the Instagram photo he found a couple of days after the shooting, and that Gina identified the man on the right with afro hair as the person who killed Michael. Richard stated before he found the photo, he did not know Barnes or that Barnes was in custody, but he knew another man in the photo. Richard testified that he believed that Barnes was the man dressed in khaki pants in the still photo taken from the surveillance video at the meat market, but he conceded it was difficult to see anything in the photo since it was so dark.

Gina testified that she and Michael were working in the storage room when two dark race men–one chubby and one skinny–appeared at the door. Gina testified that they each had a gun, and both were dressed in black and wore gloves and masks. Gina explained that the chubby man was wide and had big hair and a belly, and she could see most of his face because his mask was stretched out. Gina identified Barnes as the chubby man, and she testified that she had no trouble recognizing Barnes because she kept looking at his face during the incident to help the police catch him. Gina testified that Barnes pointed his black pistol at Michael, who gave Barnes his wallet, and the skinny man pointed his gun at her and she gave him everything she had. Gina stated that when she heard a shot, she pushed the gun from the skinny man and went towards the freezer. Gina explained they both had their hands on the gun

7

when the skinny man fired a shot that went inside the freezer. Gina testified that after Barnes was arrested, she identified Barnes in the Instagram photo Richard showed her, but she could not identify Barnes with 100% certainty in the photo lineups the police showed her.

Detective Felix Cantu Jr. of the Montgomery County Sheriff's Office testified that he assisted in Michael's homicide investigation by conducting photo lineups. Cantu showed Gina six sets of photo lineups. Cantu explained that Gina failed to make a positive identification in photo lineup five, which was the only lineup containing Barnes's photograph, but Gina selected Barnes's photo and explained he had similar characteristics as the shooter but was not 100% certain he was the shooter.

Erin Burleson, a crime scene investigator with the Montgomery County Sheriff's Office, testified that she assisted in the investigation and collected a fired bullet from a blender box and a PMC .40 caliber Smith & Wesson fired cartridge casing on the floor under a file cabinet. Burleson also collected a fired bullet from the freezer.

Sergeant Thomas Landrum with the Magnolia Police Department testified that after he received a Waller County call to be on the lookout for a dark-colored sedan involved in an attempted aggravated robbery of a meat market and a Montgomery County call about a murder at the taco stand, he stopped a vehicle matching the

8

description for speeding around 2:00 a.m. Landrum explained he waited for Officer Marc Payne because the sedan had possibly been involved in robberies and a murder. Landrum identified Barnes, who was the driver and sole occupant, and stated that Barnes was wearing a black hooded sweatshirt, an undershirt, shorts, socks, and sandals. Barnes consented to a search of the sedan, and they found evidence consistent with the information provided in the two calls. Landrum testified they found a pair of khaki pants; dark boots; a live .40 caliber Smith & Wesson round and a fired cartridge casing; a full-metal-jacket bullet, a .380 MAC-10 style gun, and marijuana.

Officer Marc Payne with the Magnolia Police Department testified that he was wearing a body camera when he assisted Landrum with the traffic stop, and the trial court admitted Payne's body-camera video into evidence. Payne testified he obtained Barnes's consent to search the sedan, which was not registered to Barnes. Payne searched the sedan and found the items about which Landry had also testified. Payne testified that Barnes said the khaki pants were his work pants. After Deputy Tiffany Fry arrested Barnes for possession of marijuana, Payne transported him to the jail. Payne seized Barnes's cell phone to preserve evidence.

Deputy Tiffany Fry of the Montgomery County Sheriff's Office testified that she assisted with Barnes's traffic stop because of the sedan's potential involvement in a series of robberies and murder. Fry testified the sedan was registered to Barnes's

9

girlfriend. Fry assisted in the search of the sedan and found a .40 caliber Winchester fired cartridge casing in the sedan and a .380 weapon without a clip or magazine. Fry explained they also found a live .40 caliber round in the sedan, but she did not know if it matched the PMC .40 caliber fired cartridge casing found at the taco stand. Fry testified that different brands of .40 caliber bullets can be used in the same pistol. Fry arrested Barnes for possession of marijuana and had the vehicle towed to the crime scene unit for processing.

On recall, Burleson, the crime scene investigator, testified she searched the sedan and collected the tan R&D brand jeans which had red-brown stains on the backside like a blood stain. Burleson explained she tested one of the stains which showed a presumptive positive for the presence of blood, and she sent the pants off for DNA testing. Burleson also collected a .380 caliber unfired cartridge casing, Barnes's birth certificate and temporary identification card, and a size-twelve pair of black utility boots which had a pair of gray gloves and fingerless long sleeves inside one boot. Burleson processed the boots, one of which had red-brown stains which showed a presumptive positive for blood, so she swabbed the boot and sent the swabs for DNA testing. Burleson also submitted the long sleeves and gloves for DNA testing.

Dr. Alex John, a forensic pathologist who formerly worked as a medical examiner in Montgomery County, testified that he conducted Michael's autopsy and

10

determined his cause of death was a gunshot wound of the head. John testified that Michael's manner of death was homicide and explained that a firearm is a deadly weapon capable of causing death or serious bodily injury. John created a DNA card on Michael for the police so a lab could extract his DNA profile for later comparison. Detective Michael Burnett of the Montgomery County Sheriff's Office testified that he collected DNA samples from Barnes and sent them to the DNA lab for testing.

Patricia Bui, a firearm and toolmark examiner with the Montgomery County Sheriff's Office Crime Laboratory testified that she compared the PMC .40 caliber Smith & Wesson fired cartridge casing found under the file cabinet in the taco stand with the .40 caliber Winchester fired cartridge casing found in the sedan. Bui testified that her comparison showed that the fired cartridge cases were fired from the same firearm, a .40 caliber handgun. Bui also compared the fired bullets recovered from a blender box and freezer at the taco stand, which were both .40 caliber Smith & Wesson, and determined they were not fired from the same firearm. Bui also determined the two fired bullets from the taco stand were not fired from the .380 firearm found in the sedan.

Danielle Reed, a senior forensic DNA analyst, testified that she performed DNA comparisons in Barnes's case. Reed explained she processed Michael's DNA card and Barnes's DNA swabs and generated DNA profiles of the known samples. Reed also processed four of the stains as well as the interior waistband of the tan

11

R&D jeans to determine who wore the pants. Reed compared the DNA profile obtained from the interior waistband with the DNA profiles from the known samples and determined there was a mixture of three or more individuals in the DNA profile from the tan jeans, including a major male contributor that contributed at least 75% to the entire profile. Reed testified that Barnes's DNA profile matched the major male contributor from the interior waistband, and the probability of selecting an unrelated individual with that DNA profile was at least 1 in 109 octillion in the population of the United States.

Reed explained the partial DNA profile obtained from one of the stains on the tan jeans matched Michael's DNA profile, and the probability of selecting an unrelated individual with that partial DNA profile was at least 1.1 octillion in the population of the United States. Concerning the other three stains, which also matched Michael's DNA profile, Reed testified that the probability of randomly selecting an unrelated individual with that partial DNA profile was at least 1 in 5.5 octillion in the population of the United States. Reed processed the two swabs taken from the boot found in the sedan and generated a DNA profile that matched Michael's DNA profile, and the statistics were also 1 in 5.5 octillion. Reed explained that the DNA profile obtained from the gray cloth gloves was consistent with a major mixture component of two male contributors, and she could not exclude Barnes as a possible contributor. The DNA profile obtained from the gray sleeves was consistent

12

with a mixture of two individuals, including a major male contributor that matched Barnes's DNA profile.

Martin, who was housed with Barnes at the Montgomery County Jail for four months, testified about his criminal history and explained that he was offered a deal to testify about what Barnes told him in jail about various robberies and the capital murder. Martin testified that Barnes told him he killed a man while robbing a taco stand in Montgomery County. Martin said that Barnes said he did not know if he or his co-defendant killed the man because they both fired shots. Martin explained that Barnes also said that the man's wife was there when the murder occurred and that they should have killed her because she could testify against him. Martin stated that Barnes told him that they also tried to rob a restaurant they had robbed before, but the people locked the doors. Martin explained he came forward because Barnes wanted to get the woman killed and asked to use his phone to take care of it. Martin testified that he read a letter Barnes sent with someone who went home, and in the letter, Barnes wanted to get the woman killed.

On cross-examination, Martin testified that he was taken out of the general population because Barnes called Barnes's mother the night before Martin was to testify and asked his mother where Martin was located within the jail. Martin stated that the phone records don't lie. Based on Martin's testimony, the State sought to introduce Barnes's jail call with Barnes's mother into evidence arguing that it

13

showed some acknowledgment of guilt. In addition, the State argued the jail call showed Barnes asked his own mother to look up Martin's jail location and that Martin was moved into administrative segregation because Barnes's mother disclosed Martin's location to Barnes. Defense counsel argued the jail call included a discussion about other extraneous conduct and objected based on Rules 403 and 404. The State agreed to redact the portion regarding the other extraneous conduct. The trial court weighed the factors under Rule 403 and determined that the jail call related to the disputed issue of the identity of the person who committed the offense and that no other evidence tended to accomplish that purpose. The trial court also stated the evidence corroborated Martin's testimony and gave him some credibility even though he was a convicted felon witness. The trial court allowed the State to admit the jail call into evidence and excluded the portion regarding the extraneous offense. The trial court overruled defense counsel's objection that the jail call showed Barnes was in custody.

Shelton Ward, the custodian of records at the Montgomery County Jail, testified that photographs were taken when Barnes was booked into the jail on December 6, 2020, for possession of marijuana. Defense counsel objected to the admission of Barnes's booking photographs based on Rule 403. The State argued that its need for the photographs was great because Barnes got multiple face tattoos after his arrest and the jury might question why his description did not include facial

14

tattoos. The trial court noted there was no unfair prejudice because there was previous testimony about Barnes being transported to jail. The trial court overruled defense counsel's objection and admitted the booking photos. Ward testified that Barnes did not have any facial tattoos in his booking photographs and that he could get tattoos in the jail. Ward testified that jail records show that Barnes and Martin were housed together in the jail from March to June 2021.

Jerry David Stovall Jr., an investigator with the Montgomery County District Attorney's Office, testified that the Montgomery County Sheriff's Office uses a system called Securus for recording the audio of their jail calls. Stovall explained that he could search jail calls using the inmate's name, name number assigned to the inmate during booking, particular jail phone location, and specific phone number. Stovall testified he reviewed Barnes's jail calls, and that Barnes uses his name number and account to make the calls. Stovall explained that Barnes made many calls, and he was familiar with the name Barnes and the voice associated with the name in the Securus system. Stovall explained he had been listening to the jail calls and the trial and the context of the trial matched up with the jail calls and led him to believe that Barnes is the man on the jail calls he listened to. Stovall had also identified Barnes's mother in the jail calls.

Stovall testified that in a jail call made two days prior, Barnes asked his mother if Martin was in jail. Defense counsel objected that Stovall had not

15

sufficiently identified Barnes. The State argued that Stovall had clearly identified Barnes by his unique pin number, name, and context by explaining Barnes was discussing the trial and a witness. The trial court overruled defense counsel's objection and granted defense counsel's request for a running objection regarding his prior overruled objections. Stovall testified that he identified a jail call Barnes made to his mother in which he discussed Martin and made an audio recording, and the trial court admitted the jail call into evidence. Stovall explained that Barnes asked his mother to do an online search and find Martin's location, which she did.

The State rested, and defense counsel moved for a directed verdict, which the trial court denied. The jury found Barnes guilty of capital murder. The trial court sentenced Barnes to life without parole. *See* Tex. Penal Code Ann. § 12.31(a)(2).

## ANALYSIS

We first address Barnes's complaint about the sufficiency of the evidence supporting the jury's verdict because, if sustained, it would result in rendition of a judgment of acquittal. *See Price v. State*, 502 S.W.3d 278, 281 (Tex. App.—Houston [14th Dist.] 2016, no pet.); *see also* Tex. R. App. P. 47.1.

In evaluating legal sufficiency of the evidence to prove the charged offense, we view all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318–19

16

(1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *see also Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020). Under the *Jackson* standard, we defer to the jury's responsibility to fairly resolve conflicting testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *See Hooper*, 214 S.W.3d at 13. The jury as factfinder is the sole judge of the weight of the evidence and witnesses' credibility, and it may believe all, some, or none of the testimony presented by the parties. *Metcalf*, 597 S.W.3d at 855 (citations omitted). We do not reweigh the evidence or determine the credibility of the evidence, nor do we substitute our judgment for the factfinder's. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). "Each fact need not point directly and independently to a defendant's guilt, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Balderas v. State*, 517 S.W.3d 756, 766 (Tex. Crim. App. 2016) (citation omitted).

A person commits capital murder if he intentionally commits murder in the course of committing or attempting to commit robbery. Tex. Penal Code Ann. § 19.03(a)(2). A person commits murder if he intentionally or knowingly causes the death of an individual. *Id.* § 19.02(b)(1). A person commits the offense of robbery if, in the course of committing theft and with intent to obtain or maintain control of the property, he intentionally, knowingly, or recklessly causes bodily injury to another. *Id.* § 29.02(a)(1). The indictment alleged that Barnes intentionally caused

17

the death of Michael by shooting Micheal with a firearm while in the course of committing or attempting to commit the offense of robbery of Michael.

The jury heard that two men attempted to rob a meat market about four hours before Michael was shot at the taco stand. Detective Fausset described the men, who were in a sedan, as a skinnier one wearing athletic pants and the other wearing khaki pants. He explained the man in khaki pants wore a mask and black clothes and boots.

The evidence showed about four hours after the meat market incident, two dark-skinned men–one chubby and one skinny–were armed and wearing masks when they entered the storage room behind the taco stand. Gina identified Barnes as the chubby man and testified that he pointed his pistol at Michael, who gave up his wallet before she heard a shot, and Detective Porter testified that Michael died from a gunshot wound. Gina testified she struggled with the skinny man, to whom she gave her belongings before he struggled with her and fired a shot towards the freezer. Richard also testified that Gina identified Barnes as the shooter, and Detective Cantu explained that Gina selected Barnes's photo in a photo lineup and explained he had similar characteristics as the shooter but was not 100% certain.

The jury heard that police collected evidence at the taco stand, which included a fired bullet from a blender box, a fired bullet from the freezer, and a PMC .40 caliber Smith & Wesson fired cartridge case. The jury heard that about an hour after Michael was shot, the police stopped Barnes, who was wearing black clothes and

driving a sedan matching the description from the meat market incident and the taco stand murder. The jury also heard that after Barnes consented to a search of the sedan, the police found a pair of khaki pants with brown stains; black boots with red-brown stains; gray gloves; long sleeves; a live .40 caliber Smith & Wesson bullet; a .40 caliber Winchester fired cartridge casing; a full-metal-jacket bullet; a .380 MAC-10 style gun; and marijuana. Burleson testified that one of the stains on the khaki pants and boots both showed a presumptive positive test for the presence of blood. The evidence showed that the PMC .40 caliber Smith & Wesson fired cartridge casing found at the taco stand and the .40 caliber Winchester fired cartridge casing found in the sedan Barnes was driving were fired from the same firearm.

The jury heard that both Michael's and Barnes's DNA was sent to a lab for testing. The jury also heard that a DNA analyst processed the khaki pants, and that comparative testing showed that Barnes's DNA profile matched the major male contributor from the interior waistband and that Michael's DNA profile matched stains on the pants and boots. The analyst also explained that Barnes's DNA profile showed he was a major male contributor on the sleeves and that he could not be excluded as a possible contributor on the gloves.

The jury considered Martin's testimony that while in jail together, Barnes told him he tried to rob a restaurant and then killed a man while robbing a taco stand and that he should have killed the man's wife because she could testify against him. The

19

jury also considered Martin's testimony that Barnes wrote a letter trying to get the man's wife killed and had gotten information about his location from his mother. The jury heard evidence that Martin and Barnes were housed together in jail and Barnes's jail call with his mother discussing Martin's location.

Viewing all the evidence in the light most favorable to the prosecution, we hold that a rational jury could have found beyond a reasonable doubt that Barnes intentionally murdered Michael while committing or attempting to commit robbery. *See id*. § 19.03(a)(2); *Jackson*, 443 U.S. at 318-19. Thus, the evidence was legally sufficient to support the jury's guilty verdict for the offense of capital murder as charged in the indictment. We overrule issue two.

*Authentication of Jail Call*

In issue one, Barnes complains the trial court abused its discretion by overruling his objection to the admission of the recorded jail call because the voices were not adequately authenticated.

We review a trial court's ruling on authentication for an abuse of discretion. *Fowler v. State*, 544 S.W.3d 844, 848 (Tex. Crim. App. 2018). Under this deferential standard, if the trial court's ruling is within the zone of reasonable disagreement, an appellate court must uphold the court's admissibility decision. *Id.*; *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012). Rule 901 outlines the authentication requirement for the admissibility of evidence, and it

requires the proponent of an item of evidence to "produce evidence sufficient to support a finding that the item is what the proponent claims it is." Tex. R. Evid. 901(a). "As with evidence in general, authenticating evidence may be direct or circumstantial." *Butler v. State*, 459 S.W.3d 595, 602 (Tex. Crim. App. 2015).

Rule 901(b) provides a nonexclusive list of methods for authenticating evidence. *See* Tex. R. Evid. 901(b). Evidence may be authenticated in several ways, including by direct testimony from a witness with personal knowledge, by comparison with other authenticated evidence, or by circumstantial evidence. *Tienda*, 358 S.W.3d at 638; *see Butler*, 459 S.W.3d at 602. Further, authenticity may be established with evidence of "'distinctive characteristics and the like,' including '[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances.'" *Acosta v. State*, No. AP-77,092, 2024 WL 2845498, at *5 (Tex. Crim. App. June 5, 2024) (per curiam) (not designated for publication) (citing Tex. R. Evid. 901(b)(4)).

One way in which a voice can be identified is with "[a] [person's] opinion identifying a voice—whether heard firsthand or through mechanical or electronic transmission or recording—based on hearing the voice at any time under circumstances that connect it with the alleged speaker." *See* Tex. R. Evid. 901(b)(5). So, a witness is qualified to identify voices in a recording for the purposes

of authentication under Rule 901 if the witness has had conversations with the speaker or if the witness has heard the voice under circumstances that connect it with the alleged speaker. *Id.*; *Angleton v. State*, 971 S.W.2d 65, 67-68 (Tex. Crim. App. 1998). Similarly, recorded jail cell calls can be sufficiently authenticated by a witness who is "familiar with the person's voice" on the calls, or who testifies about other factors that identify the speakers. *Long v. State*, No. 09-15-00295-CR, 2017 WL 1953229, at *2 (Tex. App.—Beaumont May 10, 2017, no pet.) (mem. op., not designated for publication).

The illustrations for authentication in Rule 901(b) are not exhaustive, and they do not limit the general provisions in Rule 901(a). *See Morris v. State*, 460 S.W.3d 190, 196 (Tex. App.—Houston [14th Dist.] 2015, no pet.). Other means of authenticating the identity of the speakers' voices in a telephone call include evidence such as the context of the telephone call, the contents of the statements made during the telephone call, and disclosure of knowledge and facts known particularly to the speakers. *Id.* (citing *Mosley v. State*, 355 S.W.3d 59, 69 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd)).

The authentication requirement is a liberal standard of admissibility. *Fowler*, 544 S.W.3d at 848-49 (quoting *Butler*, 459 S.W.3d at 600). The proponent must produce sufficient evidence from which a reasonable factfinder could find genuineness. *Tienda*, 358 S.W.3d at 638. Conclusive proof of authenticity is not

22

required. *Fowler*, 544 S.W.3d at 848. The trial court need only make a preliminary determination that the proponent of the evidence has supplied facts sufficient to support a reasonable jury determination that the proffered evidence is authentic. *Id.* at 849. It is up to the jury to make the final determination of whether the evidence is what the proponent claims it to be. *Butler*, 459 S.W.3d at 600.

Here, Stovall testified that the recording was made through the jail's phone call recording system by an inmate using Barnes's name number and account. Stovall testified that he reviewed Barnes's jail calls and was familiar with the name Barnes and the voice associated with the name in the system. Stovall testified that he had been observing the trial and that statements made in the jail calls matched the context of the trial, which led him to believe that Barnes was the man on the jail calls he listened to. Stovall also explained that he had identified Barnes's mother in the jail calls by the name Barnes called her. Stovall testified that in a jail call made during trial, Barnes asked his mother if Martin was in jail. At that point, defense counsel objected that Stovall had not sufficiently identified Barnes, and the State argued that Stovall had clearly identified Barnes by his unique number, name, and context by explaining Barnes was discussing the trial and a witness.

Based on this record, we conclude the trial court could have reasonably found that Stovall's identification of Barnes's voice was based on his personal knowledge, distinctive characteristics, including Barnes's name and number, and other

23

identifiers from the context and content of the jail call and the events at trial. *See* Tex. R. Evid. 901(b)(5); *Acosta*, 2024 WL 2845498, at *5; *Angleton*, 971 S.W.2d at 67-68. Accordingly, the trial court did not abuse its discretion by finding the State presented sufficient evidence to support a reasonable jury determination that the proffered evidence is authentic. *See Fowler*, 544 S.W.3d at 849; *Tienda*, 358 S.W.3d at 639-40. We overrule issue two.

*Extraneous Offense Evidence*

In issue three, Barnes complains the trial court abused its discretion by admitting extraneous-offense evidence about the attempted aggravated robbery of the meat market for the purpose of identity. *See* Tex. R. Evid. 404(b). Barnes argues the evidence was more prejudicial than probative and denied him a fair trial. *See id*. 403.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion and must uphold the trial court's ruling if it was "within the zone of reasonable disagreement." *Wells v. State*, 611 S.W.3d 396, 427 (Tex. Crim. App. 2020). This includes our review of a trial court's decision to admit evidence under Rule 404(b) for an abuse of discretion. *See Dabney v. State*, 492 S.W.3d 309, 318 (Tex. Crim. App. 2016). A trial court abuses its discretion if it acts without reference to any guiding rules and principles or acts arbitrarily or unreasonably. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019). We

24

uphold the trial court's decision if correct on any theory of law applicable to the case even if the trial court states the wrong reason for the correct ruling. *De La Paz*, 279 S.W.3d at 344; *Osbourn v. State*, 92 S.W.3d 531, 538 (Tex. Crim. App. 2002).

Relevant evidence is evidence that has any tendency to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence. *See* Tex. R. Evid. 401. Rule 404(b) of the Texas Rules of Evidence provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." *Id*. 404(b)(1). Rule 404(b)(2), however, provides for certain permitted uses of extraneous-offense evidence. *See id*. 404(b)(2). Under the rule, such evidence is admissible for "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* "[E]xtraneous-offense evidence may be admissible when a defendant raises a defensive issue that negates one of the elements of the offense." *Martin v. State*, 173 S.W.3d 463, 466 (Tex. Crim. App. 2005). "Thus, a party may introduce evidence of other crimes, wrongs, or acts if such evidence logically serves to make more or less probable an elemental fact, an evidentiary fact that inferentially leads to an elemental fact, or defensive evidence that undermines an elemental fact." *Id.*

Rule 403 permits a trial court to exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403. When conducting a Rule 403 analysis, a trial court must balance: (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006); *see also Hall v. State*, 663 S.W.3d 15, 32 (Tex. Crim. App. 2021). Rule 403 favors admitting relevant evidence and "carries a presumption that relevant evidence will be more probative than prejudicial." *Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010) (citation omitted).

Circumstances of an offense that tends to prove the allegations of the indictment are not extraneous offenses. *Camacho v. State*, 864 S.W.2d 524, 532 (Tex. Crim. App. 1993). A separate crime "'closely related in time'" that "'imparts to the trier of fact information essential to understanding the context and

26

circumstances'" of the alleged offense is admissible as same transaction contextual evidence, which can be considered without any limitation. *Popp v. State*, 634 S.W.3d 375, 394 (Tex. App.—El Paso 2021, pet. ref'd) (citation omitted); *see Nelson v. State*, 864 S.W.2d 496, 498 (Tex. Crim. App. 1993). The indictment alleged that Barnes intentionally caused Michael's death by shooting him with a firearm in the course of committing or attempting to commit robbery. Thus, any evidence that tended to prove Barnes's intent to rob Michael was relevant and admissible proof of the alleged offense. *See Popp*, 634 S.W.3d at 394.

During the pretrial hearing, the trial court considered the State's argument that the attempted aggravated robbery was admissible as same transaction contextual evidence. Considering the short time frame between the attempted aggravated robbery and Michael's murder, as well as the similarities in both incidents–the wearing of dark clothes and masks and the use of firearms–the attempted aggravated robbery tended to prove that Barnes and his co-defendant were engaged in a crime spree involving the robbery of food establishments at gunpoint. The surveillance video from the meat market established that Barnes was aware of both the presence of a firearm and its intended use to perform a robbery. Thus, the trial court may have reasonably concluded the attempted aggravated robbery was not an extraneous offense but intrinsic evidence of a course of continuing conduct relevant to prove

Barnes's intent to rob Michael and that Michael's death was caused in the course of a robbery or attempted robbery. *See id.*

The record also shows that during his opening statement, defense counsel raised the issue of identity, arguing that Barnes was not the shooter. The attempted aggravated robbery tended to prove Barnes's identity by providing the jury with essential information to understand how the khaki pants with Michael's DNA found in the sedan linked Barnes to both crimes. *See Nelson*, 864 S.W.2d at 498. Because the evidence about the attempted aggravated robbery tended to show Barnes's intent to rob the deceased and was relevant and admissible proof of the alleged offense, the trial court did not abuse its discretion by finding it was admissible as same transaction contextual evidence. *See Popp*, 634 S.W.3d at 394. While Barnes also complains the trial court erred by admitting the evidence because it was more prejudicial than probative, we conclude the trial court's decision was "within the zone of reasonable disagreement." *See Wells*, 611 S.W.3d at 427; *Montgomery v. State*, 810 S.W.2d 372, 377-80 (Tex. Crim App. 1990). We overrule issue three.

*Admission of Identification Evidence*

In issue four, Barnes complains the trial court abused its discretion by overruling his objection to the admission of the Instagram photograph and Gina's in-court identification of him as the shooter. Barnes complains that the pretrial identification procedure was impermissibly suggestive and gave rise to a very

28

substantial likelihood of irreparable misidentification. Barnes argues that Gina was unable to positively identify him in a photo lineup until Richard showed her the Instagram photograph. The State argues that Barnes waived any error because he did not object to Gina's in-court identification of Barnes or object that her pretrial identification resulted from an impermissibly suggestive identification procedure.

To preserve a complaint for appellate review, a party must timely object to the evidence with enough specificity to let the trial court know what he wants and why. *See* Tex. R. App. P. 33.1(a). A defendant must object at trial to an in-court identification or to testimony based on an alleged impermissibly suggestive pretrial identification procedure to preserve error. *Perry v. State*, 703 S.W.2d 668, 670-71 (Tex. Crim. App. 1986); *see also Barley v. State*, 906 S.W.2d 27, 33-34 (Tex. Crim. App. 1995). The defendant's issue on appeal must comport with the specific objections he made at trial. *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002).

The record shows the trial court admitted the Instagram photograph during Richard's testimony and that defense counsel objected based on hearsay and Rules 403 and 404. While defense counsel complained the Instagram photo was highly suggestive and prejudicial, he agreed it was not part of a photo lineup or presented by the police. The trial court considered the State's argument it was laying the foundation for Gina's out-of-court identification of Barnes to Richard, and that

29

Richard's testimony about Gina's identification was not hearsay under Rule 801. *See* Tex. R. Evid. 801(e)(1)(C). The trial court overruled defense counsel's objections to the Instagram photo and admitted the photo. Based on our review of the record, Barnes's objections to the Instagram photo at trial do not comport with his tainted-identification argument on appeal.

With respect to Gina's in-court identification of Barnes, the record shows that Gina testified that the chubby man had big hair, and she could see most of his face because his mask was stretched out. Gina identified Barnes as the chubby man without any objection, and she testified that she had no trouble recognizing Barnes because she kept looking at his face during the incident to help the police catch him. Gina also testified about her pretrial identification of Barnes in the Instagram photo without objection, and she explained she could not identify Barnes in the photo lineups the police showed her with 100% certainty. While the trial court gave defense counsel a running objection to the admission of the Instagram photo based on Rules 403, 404, and 801, defense counsel did not object that Gina's pretrial identification of Barnes resulted from an impermissibly suggestive identification procedure.

We conclude that Barnes waived this issue because he failed to object to Gina's in-court identification and failed to object during Gina's testimony that her pretrial identification of Barnes resulted from an impermissibly suggestive

identification procedure, and because his objections at trial regarding the Instagram photo do not comport with his argument on appeal. We overrule issue four.

## CONCLUSION

Having overruled all of Barnes's issues, we affirm the trial court's judgment.

AFFIRMED.

JAY WRIGHT
Justice

Submitted on August 28, 2025
Opinion Delivered October 15, 2025
Do Not Publish

Before Golemon, C.J., Wright and Chambers, JJ.

31